MANUEL ROSADO MARZÁN, demandante y recurrido, *v.* MARCELINA RIVERA GARCÍA, demandada y recurrente.

Número 11576

*Sometido:* 3 de junio de 1957. *Resuelto:* 30 de marzo de 1959.

*José R. Fournier,* abogado de la recurrente; *Mario A. Rodríguez,* abogado del recurrido.

El Juez Asociado Señor Pérez Pimentel emitió la opinión del Tribunal.

Manuel Rosado Marzán interpuso acción de divorcio contra su esposa Marcelina García ante el Tribunal Superior de Puerto Rico. En una demanda enmendada alegó como causa de acción que "la demandada al casarse con el demandante se encontraba en estado de embarazo de otro hombre, ya que el demandante no había tenido relaciones sexuales con la demandada hasta el momento del casamiento y la demandada dió a luz el 20 de febrero de 1954 exactamente seis (6) meses tres (3) días después de la fecha de haber contraído matrimonio; "que esta actuación de parte de la demandada para con el demandante al engañarlo en esta forma le ha ocasionado serios desajustes emocionales y espirituales ya que la demandada a quien él creía una mujer virgen en el momento del matrimonio resultó en estado de embarazo para esa fecha."

La demandada solicitó la desestimación de esta demanda por el fundamento de que en ella no se exponían hechos constitutivos de una causa de acción. Declarada sin lugar dicha moción, contestó negando generalmente todos los hechos.

Después de celebrarse un juicio en los méritos, el tribunal a quo dictó sentencia decretando el divorcio entre las partes por la causal de trato cruel e injurias graves por parte de la mujer hacia el marido y declaró además, que el hijo nacido dentro del matrimonio el día 21 de febrero de 1954 no es hijo del demandante Rosado Marzán. Como base de dicha sentencia, el tribunal a quo, formuló las siguientes únicas conclusiones de hecho:

"La prueba ha convencido al Tribunal que el 17 de agosto de 1953 Manuel Rosado Marzán contrajo matrimonio con Marcelina Rivera García; que cuando Marcelina se casó con Manuel ya estaba embarazada de otro hombre que no es el demandante; que el demandante se dió cuenta de esta situación e inmediatamente entregó a Marcelina a su padre explicándole el porqué de este rompimiento súbito. La demandada dió a luz el día 21 de febrero de 1954. Para agosto 17 de 1953, cuando se casó,

ya estaba encinta y el padre de la criatura no era precisamente Manuel Rosado Marzán, persona ésta que había llegado de servir al Ejército en Alemania el 24 de junio de 1953.

"Entiende el Tribunal que la actitud asumida en este asunto por Marcelina Rivera García envuelve trato cruel e injurias graves y por tal causa debe dictarse sentencia declarándose con lugar la demanda, con las costas a cargo de la demandada, incluyendo la suma de cien dólares ($100) para los honorarios del abogado del demandante."

En este recurso la demandada-apelante imputa varios errores al tribunal sentenciador. Sin embargo bastará que consideremos el más importante de ellos, a saber: si los hechos alegados y considerados probados constituyen el trato cruel o las injurias graves que el Código Civil establece como causa de divorcio.

Corresponde a la legislatura el poder de regular la institución del matrimonio, su celebración, régimen y disolución por tratarse de cuestiones de política e interés públicos. En su consecuencia, el divorcio, que es una de las formas de disolver el matrimonio, sólo puede concederse de la manera y por las causas establecidas en la ley.(1)

Nuestro Código Civil, en su art. 96 [31 L.P.R.A., sec. 321], enumera diez causas de divorcio. No existen otras. El embarazo antenupcial de la mujer por otro hombre, sin que el marido tenga conocimiento de ello al momento de contraer matrimonio, no figura expresamente en nuestro Código como una de las causas de divorcio. De suerte que a menos que este hecho se considere como constitutivo del "trato cruel o las injurias graves", que señala el citado art. 96 del Código Civil, en su inciso 4 como causa de divorcio, la acción de divorcio ejercitada por el demandante-apelado en este caso no puede prosperar.

---

(1) *Pérez Valdivieso* v. *León*, 52 D.P.R. 512; 17 *Am. Jur.*, sec. 7, pág. 150; 27 C.J.S., sec. 8, pág. 527; Keezer, *Marriage and Divorce*, sec. 4, pág. 10; Schouler, *Divorce Manual*, secs. 12 y 13, pág. 14 y siguientes; *Kasal* v. *Kasal*, 35 N.W.2d 745, 746 y casos citados al escolio 1; *Gerber* v. *Gerber*, 64 N.W.2d 779, 781; *Moody* v. *Moody*, 288 P.2d 229, 230; *Fix* v. *Fix*, 204 P.2d 1066.

En múltiples ocasiones hemos examinado la conducta de uno de los cónyuges hacia el otro para determinar, si a los efectos del divorcio, tal conducta constituye trato cruel e injurias graves.(²) Sin embargo, nunca antes pasamos sobre la cuestión que está ahora ante nos. Tampoco hemos encontrado decisión alguna en las jurisdicciones americanas que sostenga que el hecho de que la mujer oculte al marido su estado de embarazo de otro hombre, al contraer matrimonio, siendo además dicho hecho desconocido por el marido, constituya el trato cruel y las injurias graves que la ley señala como causa de divorcio. Discutiendo lo que constituye "crueldad mental", Nelson, en su obra *Divorce and Annulment*, sec. 6.06, pág. 222, dice que los actos constitutivos de crueldad mental, considerados aisladamente o en conexión con otros, presentan una variedad infinita y que incluyen hasta la ocultación del embarazo antenupcial. En apoyo de esta afirmación el indicado autor cita las anotaciones en 13 A.L.R. 1435; pero a poco que se examine la referida anotación, se verá que la jurisprudencia allí citada no ha resuelto que el embarazo antenupcial de la mujer por otro hombre sin que el marido tenga conocimiento de ello al momento de contraer matrimonio, constituya trato cruel e injurias graves. Lo que ocurre es que los estatutos de algunos Estados establecen ese hecho como causal de divorcio. En otros Estados la conducta de la mujer al ocultar al marido su estado de embarazo al momento de contraer matrimonio, se considera como un fraude que autoriza al marido a solicitar la nulidad del matrimonio.(³) Es significativo, sin embargo, que en aquellos

(²) Véase *Morales* v. *Vélez*, 75 D.P.R. 960; *Bosch* v. *Ruiz*, 68 D.P.R. 945; *Marques* v. *Rivera*, 68 D.P.R. 719; *Gómez* v. *Trujillo*, 59 D.P.R. 468; *Arce* v. *Lebis*, 50 D.P.R. 899; *Manich* v. *Quero*, 38 D.P.R. 93; *Forteza* v. *Enrich*, 18 D.P.R. 27; *Morales* v. *Rivera*, 8 D.P.R. 463; *Cruz* v. *Domínguez*, 8 D.P.R. 580.

(³) El embarazo antenupcial de la mujer por otro hombre al momento de contraer matrimonio y desconocido por el marido es causa de divorcio en los Estados de Alabama, Arizona, Georgia, Iowa, Kansas, Kentucky, Mississipi, Missouri, New Mexico, North Carolina, Oklahoma, Tennessee, Virginia y Wyoming. Véase Vernier, *American Family Laws*, tomo 2,

Estados donde el embarazo antenupcial es causa de divorcio (véase escolio 3) también existe como causa de divorcio adicional, separada e independiente de aquélla, el trato cruel.[4]

En América Central, los códigos de las repúblicas de Honduras, Nicaragua y El Salvador incluyen como causa de divorcio el embarazo de la mujer por otro hombre, antes de la celebración del matrimonio cuando esta condición es ignorada por el marido al momento de celebrarse la boda. Sin embargo, en dichos códigos se consignan también como otra causal de divorcio, el trato cruel y las injurias graves. Ireland & Galindez, *Divorce in the Americas*, (1947) págs. 186, 210 y 245.

■■ De todo lo expuesto anteriormente puede concluirse que el *embarazo antenupcial* de la mujer, no ha sido considerado como trato cruel e injurias graves hacia el marido engañado y que solamente se ha concedido el divorcio, a base de ese hecho, en aquellas jurisdicciones donde el estatuto expresamente lo consigna como una causa de divorcio.[5] En ausencia de un estatuto en contrario, el divorcio es la disolución del vínculo matrimonial *por una causa surgida después de su celebración*, basado, desde luego, en la teoría de

págs. 66 a 71; *The Truth About Divorce*, Ploscowe, págs. 264–294; Anotaciones en 13 A.L.R. 1435; Keezer, *Marriage and Divorce* (3ra. ed.), sec. 491, pág. 528. En otros Estados el embarazo antenupcial es causa de nulidad y no de divorcio. Para un amplio estudio sobre esta cuestión, véase 2 Bishop *Marriage, Divorce and Separation*, págs. 208–219. Revistas jurídicas que tratan la cuestión del embarazo como causa de divorcio o nulidad son: Kingley, *Fraud as a Ground for Annulment of a Marriage*, 18 So. Cal. L. Rev. 215; *Recent Cases*, 91 U. Pa. L. Rev. 473; Robert E. Lull, *Annulment of Marriage for Fraud*, 32 Cornell L. Q. 424; Walter L. Miller, *Annulment of Marriage for Fraud: Antenupcial Pregnancy*, 6 Cornell L. Q. 328; *Recent Decisions*, 15 Va. L. Rev. 387.

([1])Esto es así excepto en los Estados de North Carolina y Virginia, donde el trato cruel es causa de separación de mesa y tálamo pero no de divorcio absoluto. "The General Statutes of North Carolina" (1950), Vol. 2A, sec. 20, pág. 622; *Code of Virginia*, (1950), vol. 4, sec. 20–95, pág. 410.

([5])17 Am. Jur., *Divorce & Separation*, sec. 144, pág. 352 (ed. 1957); Anotación en 15 A.L.R.2d pág. 694.

la existencia de un matrimonio válido.(⁶) Ciertamente no puede decirse que el engaño perpetrado por la mujer, ocultando a su marido su estado de embarazo por otro hombre, al contraer matrimonio, es un hecho que surge después de la celebración del matrimonio. No se olvide que precisamente el demandante en este caso, funda su acción de divorcio en la ocultación del estado físico de la demandada. El demandante descubrió el hecho después de celebrado el matrimonio pero el acto de crueldad, si alguno, no consiste en que la mujer continuara ocultando su estado físico después del matrimonio. Si fuéramos a calificar de cruel la actitud de la demandada, tendríamos que referirnos a su actitud antenupcial, a la ocultación del hecho del embarazo en el momento y antes de la celebración del matrimonio que según el demandante, le ha ocasionado serios desajustes emocionales y espirituales; pero los actos de crueldad o las injurias graves ocurridas antes del matrimonio no son causa de divorcio en Puerto Rico.(⁷) Resolvemos, en su consecuencia, que la acción de divorcio no procede en el caso de autos.(⁸)

*Debe revocarse la sentencia recurrida y dictarse otra declarando sin lugar la demanda con las costas.*

Los Jueces Presidente Sr. Negrón Fernández y Asociado Sr. Saldaña disintieron.

(⁶) *Rambo* v. *Rambo*, 16 So.2d 4; *García* v. *García*, 232 S.W.2d 782, 783 (1950); *Mazzei* v. *Cantales*, 112 A.2d 205, 208 (1955); *In re Crump's Estate*, 166 P.2d 684, 688 (1946); *Goff* v. *Goff*, 125 P.2d 848, 852 (1942).

(⁷) Louisiana reconoce, además de la muerte de uno de los cónyuges, dos maneras de disolver el vínculo matrimonial, a saber, el divorcio y la nulidad. Estas dos maneras de disolución se complementan entre sí pues mientras el divorcio sólo puede concederse por causas que surgen después del matrimonio, la nulidad sólo puede ser decretada por una causa que existió con anterioridad al matrimonio o contemporáneamente con éste. 24 Tul. L. Rev. 217; Vernier, supra, Vol. 1, sec. 50, pág. 239.

(⁸) Sin embargo, por la forma en que quedó trabada la controversia en virtud de las alegaciones y la prueba practicada, no hemos entrado a considerar si el demandante-apelado tiene o no una causa de acción sobre nulidad de matrimonio.

Opinión concurrente del JUEZ ASOCIADO SR. SERRANO GEYLS.

Estoy en parte de acuerdo con la evaluación de la tarea judicial que hace el Juez Asociado Sr. Saldaña en su opinión disidente. No obstante, estimo que falta en esa evaluación un elemento vital y que, además, las circunstancias de este caso no permiten el ejercicio de la discreción judicial que el criterio disidente propugna. Esas razones, y la gran importancia de la cuestión planteada, me obligan a expresar una opinión por separado en la cual examinaré los alcances de la propuesta disidente, las circunstancias históricas dentro de las cuales se ha desarrollado nuestra legislación, las diferencias entre la situación de Francia y la nuestra y la actitud y las actuaciones de nuestros legisladores con referencia al régimen de la familia.

I

El criterio disidente no propone que hagamos una interpretación de la frase "injuria grave" para incluir exclusivamente la disimulación por la mujer del embarazo antenupcial por otro hombre. Esta es sólo una aplicación—tal vez la más extrema—de una propuesta más amplia, que recomienda la adopción del dolo, fraude o engaño como motivo de divorcio, siempre que se ajuste a los siguientes cinco requisitos: 1—el hecho se haya ocultado o disimulado de mala fe; 2—la disimulación se haya prolongado por lo menos hasta el momento de celebrarse el matrimonio; 3—el hecho sea de naturaleza grave; 4—no sea notorio; y 5—sea desconocido totalmente por el otro cónyuge. Para aplicar esas normas en situaciones concretas se sugiere como guía "el sentimiento de justicia que es parte de las convicciones o creencias que de hecho actúan sobre las gentes en una sociedad".

Es indispensable, a mi juicio, darle mayor concreción a esa propuesta para poder calibrar sus dimensiones adecuadamente. No es necesario utilizar recursos imaginativos

para ese propósito, pues afortunadamente, la experiencia de varios países nos ofrece ilustraciones valiosas. Examinemos lo ocurrido en los Estados Unidos, Alemania y Francia. [1] En los dos primeros el fraude, dolo o engaño es motivo de nulidad, mientras que en el último, y por interpretación de la frase "injuria grave", lo es de divorcio. Aunque esto apareja diferencias importantes en cuanto a los efectos sobre los cónyuges, los hijos y los bienes habidos durante el matrimonio dependiendo del derecho positivo de cada jurisdicción, no tiene importancia en cuanto al fin que aquí perseguimos: ilustrar con situaciones reales el alcance de la doctrina.

En los estados de la Unión norteamericana que aceptan el fraude como causa de nulidad, [2] se aplican al matrimonio las reglas de la contratación general, exigiéndose que la disimulación, además de haber inducido al quejoso a contraer el vínculo, sea de suficiente importancia para justificar una intervención del estado en un status revestido de gran interés público. Se exige generalmente que sean actuaciones que afecten los aspectos esenciales del matrimonio. Aunque hay divergencias importantes entre los estados en cuanto al contenido de estas categorías generales, destacándose Nueva York [3] por su gran liberalidad, es posible hacer una enumeración de situaciones surgidas antes del matrimonio que constituyen fraude al ser ocultadas al otro cónyuge. Son las siguientes: el embarazo antenupcial por otro hombre, ya sea ocultando el hecho o haciéndole creer al marido que el hijo es de él; la alegación falsa de preñez o de que un hijo

---

[1] Un valioso análisis del derecho romano, canónico, francés, italiano, alemán, suizo, brasileño y argentino se encuentra en 1 Alberto C. Spota, Tratado de Derecho Civil, vol. 3 (1957).

[2] Véase en general Kingsley, *Fraud as a Ground for Annulment of a Marriage*, 18 So. Cal. L. Rev. 213 (1945); Vanneman, *Annulment of Marriage for Fraud*, 9 Minn. L. Rev. 497 (1925); 55 Corpus Juris, sec. 866.

[3] La jurisprudencia de Nueva York se discute en Kingsley y Vanneman, *ops. cits.*, supra y en 32 Cornell L. Q. 424 (1947) y 3 La. L. Rev. 831 (1941).

ya nacido es del marido; una enfermedad contagiosa e incurable, por lo general, una enfermedad venérea, (4) la esterilidad; una enfermedad mental que no se manifiesta al momento de celebrarse la ceremonia (5) o una enfermedad mental en la familia; ausencia de amor o afecto cuando va unida a una intención secreta de no consumar el matrimonio o de apropiarse de dinero o propiedad del otro cónyuge y abandonarlo; la condena penal, particularmente si la engañada es una mujer joven y sin experiencia; el perjurio al obtener la licencia de matrimonio; la raza, cuando es en violación de una ley que prohibe la mezcla de razas; la ciudadanía, cuando el efecto es producir la expatriación de la mujer o cuando el otro cónyuge ha exigido la ciudadanía como condición expresa del matrimonio; la pobreza, si la engañada es una mujer joven y sin experiencia, o si el demandado se ha casado con el único propósito de tener acceso al dinero de la demandante; un matrimonio anterior, cuando la engañada es joven y sin experiencia, o cuando se ha violado una ley que prohibe casarse antes de transcurrir cierto tiempo de haberse decretado el divorcio; la intención de no consumar el matrimonio o de hacerlo únicamente utilizando contraceptivos; la negativa a celebrar una ceremonia religiosa luego de la civil, si se ha hecho una promesa en tal sentido. (6)

En Alemania son causas de nulidad tanto el error como el dolo. El primero, se refiere al error de identidad y al error sobre ciertas cualidades esenciales. Este último cubre el caso en que "al concluir el matrimonio uno de los contrayentes yerra sobre ciertas cualidades del otro que, de haber

---

(4) Algunos estados han incluído la tuberculosis y la epilepsia.

(5) No debe confundirse esta situación con la que se produce cuando una persona está mentalmente desequilibrada al momento de celebrarse el matrimonio. Véanse, Shea, *The Effect of Insanity at the Time of Marriage*, 16 La. L. Rev. 511 (1956); Wisdom, *Marriage-Contractual Capacity-Insane Persons*, 28 Tul. L. Rev. 403 (1954).

(6) Algunos estados han aceptado varias de estas situaciones como causas de nulidad únicamente cuando no se ha consumado el matrimonio.

conocido la verdadera situación y de haber ponderado racionalmente la esencia del matrimonio, se hubiera abstenido de contraerlo." (⁷) Las cualidades personales, comentan Kipp-Wolff, son "aquellas notas que caracterizan un bien interno de la personalidad, en contraposición a la caracterización de la persona obtenida al través de bienes o circunstancias personales." (⁸)

". . . Por tanto, son cualidades personales: en primer lugar, todas las características corporales, por ejemplo, la virginidad, la fecundidad, la salud, la raza, la edad, también el nacimiento; segundo, todas las cualidades morales, como la bondad, la honorabilidad, la flexibilidad, el dominio de sí mismo; en tercer lugar, todas las cualidades espirituales como la inteligencia y la aptitud artística. Por el contrario, no son cualidades personales, siendo indiferente a tal efecto que el concepto de cualidad se configure más estrictamente o que se niegue lo personal de la cualidad, el nombre, la nobleza, la profesión, la pertenencia a una determinada familia (de modo que, por ejemplo, un cónyuge que ignora que el otro no es hijo de matrimonio o los cónyuges católicos que no saben que son parientes en su grado canónico del que resulta la prohibición del matrimonio, no pueden impugnarlo), la condición de miembro de una corporación de derecho público o privado (municipalidad, nacionalidad, pertenencia a una comunidad eclesiástica), la pertenencia a una determinada esfera social y, finalmente el patrimonio.—Es indiferente que la cualidad sea innata o adquirida (enfermedad) o si constituye o no medio de identificación, como también en principio, si es duradera o transitoria." (⁹)

Mas adelante y apoyándose en la jurisprudencia alemana, comentan Kipp-Wolff sobre las condiciones que afectan la esencia del matrimonio.

(⁷)1 Enneccerus-Kipp-Wolff, Tratado de Derecho Civil, tomo IV (2da. ed. 1953).

(⁸)*Id.*, pág. 153.

(⁹)*Id.*, pág. 153.

"Así, pues, la avaricia y la manía de dilapidación, la necedad y la fatuidad, la indiscreción y la irascibilidad, la nerviosidad y la propensión a las enfermedades (o a una enfermedad determinada) e incluso una cierta manía de mentir, difícilmente autorizarán al que las desconoce para impugnar el matrimonio. Ha de tratarse más bien de cualidades a las que no tiene por qué allanarse ni siquiera el que esté dispuesto a sufrir graves desengaños. A estos efectos se habrá de dar gran importancia a las concepciones dominantes en la esfera social de los cónyuges. Como causas de impugnación, merecen atención especial: el error sobre la virginidad de la novia, el desconocimiento de que ha nacido fuera de matrimonio, la ignorancia de la *impotencia coeundi* incurable, y también sin duda, la esterilidad, el homosexualismo, una grave enfermedad mental (como la epilepsia, la *dementia praecox*, la imbecilidad de nacimiento, la morfinomanía, etc.), el desconocimiento de enfermedades corporales graves e incurables o, por lo menos, crónicas (como la tuberculosis, tabes, enfermedad sexual no curada), la ignorancia de inclinaciones criminales, la conducta inmoral, el grave hábito de mentir, la dipsomanía." ([10])

La diferencia fundamental en Alemania entre el error y el dolo, en el aspecto que aquí nos concierne, es la de que en el último "pueden ser causa de impugnación las circunstancias que no constituyen cualidades personales, si el error relativo a ellas ha sido provocado por engaño doloso."

"Interesan ante todo los engaños sobre penas infamantes sufridas por uno de los prometidos o por sus padres, o sobre la existencia del consentimiento paterno, el aparentar la intención de recibir la bendición eclesiástica después del matrimonio, o de educar a los hijos en una determinada religión, la ocultación de una profesión deshonrosa o que esté muy por debajo de la condición social de la novia, o de la

([10]) *Id.*, pág. 154.

existencia de hijos anteriores al matrimonio, o de una operación que destruye la posibilidad de parir." (¹¹)

En Francia aunque el Código consagra el *error en la persona* como causa de nulidad, los tribunales lo han interpretado restrictivamente para incluir únicamente el error en la *identidad* de la persona y no en sus *cualidades*. Por el contrario, han ampliado la causa de divorcio conocida como la "injuria grave" de manera que cubra actuaciones fraudulentas o dolosas realizadas con anterioridad al matrimonio y desconocidas para el cónyuge que solicita el divorcio. Se exige el cumplimiento de dos condiciones: el hecho debe ser de tal gravedad que de ser conocido hubiese impulsado al otro cónyuge a no contraer el vínculo, y debe habérsele ocultado al otro cónyuge o, por lo menos, no habérsele revelado. (¹²) Dentro de esas circunstancias los siguientes hechos han sido aceptados por la jurisprudencia francesa: (¹³) la impotencia del marido, la malformación física de la mujer que impida la consumación o la concepción, la alegación falsa de preñez, las enfermedades venéreas, el embarazo antenupcial por otro hombre o la existencia de un hijo, la falta de virginidad en la mujer, el estado eclesiástico del marido, las enfermedades mentales, la condena penal por un hecho contrario al honor y a la moral, la inscripción de la mujer en el registro de prostitutas, la promesa a un tercero de una suma importante que el futuro esposo no podría pagar sino gracias a la fortuna de la mujer, el incumplimiento de una promesa de educar al hijo en la religión católica o de una promesa de celebrar una ceremonia religiosa luego de la civil.

Como podrá observarse de este sucinto resumen de la experiencia norteamericana, alemana y francesa, (¹⁴) la acep-

(¹¹) *Id.*, pág. 156.

(¹²) 2 Dalloz, *Repertoire de Droit Civil* 127 (1952).

(¹³) *Id.*, págs. 127–128; *Id., Mise a Jour*, pág. 60 (1958) y Aubry y Rau, *Droit Civil Francais* 227 (1948).

(¹⁴) Para no alargar demasiado esta opinión solamente he incluído en este resumen los hechos que cada país ha aceptado como constitutivos de fraude, dolo o disimulación y he eliminado aquellos que la jurisprudencia

tación del fraude, dolo o engaño como motivo de divorcio constituiría una innovación radicalísima en nuestro derecho de familia que habría de tener profundos efectos sobre el régimen del matrimonio. No creo sea exagerado decir que tanto en términos estadísticos, ([15]) como por su impacto sobre la institución de la familia y sobre las disposiciones de ley, se convertiría en el más importante de los motivos de divorcio en nuestro país, probablemente con una mayor frondosidad que la causa de "injuria grave", como ésta se concibe en la actualidad.

ha rechazado. No obstante, creo que para obtener una visión completa del asunto es conveniente conocer también estos últimos. Para esos propósitos deben consultarse las obras mencionadas en los escolios.

([15]) Me refiero, desde luego, a divorcios contenciosos. Presumo que las causas de separación, abandono e injuria grave, por haberse convertido en la práctica en medios acomodaticios de obtener el divorcio "por consentimiento mutuo", continuarían proveyendo, como hasta ahora, la gran mayoría de los divorcios no contenciosos. Los datos suministrados por la Oficina de Administración de los Tribunales revelan que la siguiente es la situación que ha prevalecido en los últimos tres años en cuanto a casos contenciosos y no contenciosos:

| Causa | 1955-56 | | 1956-57 | | 1957-58 | |
|---|---|---|---|---|---|---|
| | Cont.[a] | No Cont. | Cont. | No Cont. | Cont. | No Cont. |
| Abandono | 91 | 1660 | 41 | 1657 | 36 | 1726 |
| Adulterio | 15 | 284 | 12 | 238 | 13 | 332 |
| Condena Penal | | 5 | | 5 | | 7 |
| Embriaguez | | 6 | 1 | 4 | | 1 |
| Locura | | 4 | 2 | 1 | | 5 |
| Separación | 157 | 2563 | 69 | 2679 | 56 | 3232 |
| Injuria Grave | 81 | 1445 | 42 | 1321 | 71 | 1698 |
| Impotencia | | | | 1 | 1 | |
| Corrupción hijos | | | | | | |
| Propuesta Prostituir Mujer | | | | | | |
| TOTAL | 344 | 5967 | 167 | 5906 | 177 | 6861 |

[a] Se refiere a pleitos en los cuales se efectuó una vista con asistencia de ambas partes y se trabó en realidad una controversia. Los "no contenciosos" incluyen a todos los otros. El más alto número de "contenciosos" en 1955-56 se debe únicamente a que algunas de las salas del Tribunal Superior no aplicaron la definición debidamente.

## II

Examinemos brevemente las circunstancias históricas.

*Primero:* Ni la legislación española moderna([16]) ni la legislación puertorriqueña jamás han reconocido *expresamente* el dolo, fraude o engaño como causa de nulidad del matrimonio o como causa de divorcio. En realidad, y fuera de los Estados Unidos,([17]) son contadas las jurisdicciones que han adoptado una de estas dos modalidades. Luis Fernández Clérigo en su libro El Derecho de Familia en la Legislación Comparada (1947) apunta que Alemania, Suiza, Suecia, Estonia y Portugal en Europa, y Argentina y México en Latinoamérica son los países que aceptan el dolo o fraude o alguna de sus modalidades como causa de nulidad (págs. 110–112) y no menciona ninguno que lo acepte como causa de divorcio([18]) (págs. 130–137).

*Segundo:* Los legisladores puertorriqueños recibieron a principios de siglo una propuesta específica para que se adoptara el "fraude" como causa de nulidad del matrimonio y no la aprobaron. El Informe de la Comisión para Revisar y Compilar las Leyes de Puerto Rico (1901) en la sec. 17 de su proyecto de "Ley para el Régimen del Matrimonio y Divorcio" propuso lo siguiente: ". . . si el consentimiento de alguna de las partes se hubiere obtenido por medio de fuerza, coacción o fraude, será nulo el matrimonio desde el momento en que así lo declarare un tribunal competente, según se dispone en el siguiente título."([19])

*Tercero:* El embarazo antenupcial por otro hombre tampoco ha figurado *expresamente* en la legislación española ni en la nuestra como motivo de nulidad o de divorcio. Como

---

([16]) Por limitaciones de tiempo me ha sido imposible examinar la legislación española anterior al siglo XIX.

([17]) La situación que prevalece en los Estados Unidos se describe tanto en la opinión del Tribunal como en la disidente.

([18]) Véase, además, la reseña de los códigos europeos y americanos en 2 Scaevola, Código Civil (5ta ed., 1946) págs. 27–291.

([19]) Tomo II, pág. 639.

se apunta en la opinión del Tribunal, algunos estados de la Unión norteamericana y las repúblicas de Honduras, Nicaragua y el Salvador sí tienen tales disposiciones. Hasta donde sabemos, ninguno de los países europeos ha seguido esa trayectoria.

*Cuarto:* Ni la jurisprudencia española ni ninguno de los comentaristas del Código Civil español han aceptado que cabe interpretar la causa de "malos tratamientos de obra, o injurias graves" de dicho Código (art. 105) que es el precedente inmediato de la nuestra, en el sentido de incluir actuaciones prenupciales fraudulentas o dolosas de uno de los cónyuges. La única alusión a ese problema que hemos hallado, se encuentra en Scaevola, ([20]) quien, por ser "venturosamente tan estéril" la jurisprudencia española, acude "por vía de instructivo antecedente" a la jurisprudencia francesa y en las sentencias que enumera incluye algunas consagrando tal interpretación. En realidad, que sepamos, ni en los Estados Unidos, ni en Latinoamérica, ni en Europa con excepción de Francia y Bélgica, se ha adoptado esa interpretación.

*Quinto:* La jurisprudencia española no ha reconocido todavía que a la causa de nulidad conocida como *el error en la persona* pueda incorporarse el dolo, fraude o engaño por vía de interpretación. Luego de afirmar que "No afectan . . . a la validez del matrimonio la simulación, la reserva mental ni el dolo, respecto de los cuales guarda silencio el Código" escribe Castán([21]) en 1955:

"Se suscita con toda legitimidad—hemos dicho en otra parte—el problema de si ese error de que habla el Código Civil se ciñe estrictamente al error sobre la identidad de la persona, o alcanza también, como en el art. 1.266 y en los precedentes canónicos, a las cualidades que redunden sobre la persona. La falta total de jurisprudencia aplicable al

---

([20]) *Op. cit.,* págs. 785, 787.
([21]) 5 Derecho Civil Español, Común y Foral, 125, 129 (1955).

problema dificulta la solución, pues si de un lado cabe aducir la necesidad de que la relación matrimonial sea segura, por otra parte no puede menos de recordarse la trascendencia del acto del matrimonio y la importancia que tienen la libertad y ausencia de vicio en el consentimiento. De estimarse que en la fórmula del precepto legal caben, como constitutivos de error en la persona, no sólo el error sobre la identidad (caso raro y difícil en la práctica), sino también el que recae sobre las cualidades personales, habrá que circunscribir esta última modalidad, por analogía a lo que dispone el art. 1.266 con respecto al error en los contratos que tienen por objeto una cosa, a aquellas cualidades de la persona que pueden considerarse esenciales, dentro de la estimación dominante en la esfera social de los contrayentes."

Hemos examinado la jurisprudencia española posterior a 1954 y no hemos encontrado una sola sentencia relativa al problema.[22]

Puig Peña,[23] Manresa,[24] Scaevola,[25] y Sánchez Román,[26] comparten el criterio interpretativo de Castán mientras que Valverde,[27] Fernández Clérigo,[28] y Martínez Ruiz[29] prefieren una solución más restrictiva que no admite el error sobre las cualidades de la persona, sino únicamente sobre su identidad.

Fernández Clérigo indica, refiriéndose al error sobre las cualidades de la persona, que "muy dispares son las opinio-

---

[22] Interpretando la disposición del Código Civil español resolvió este Tribunal en *López* v. *Valdespino*, 6 D.P.R. 172, 177 (2da. ed. 1904) que el error en la persona tiene que ser uno que vicie el consentimiento y no uno que se refiera a un estado puramente accidental de la persona del otro contrayente.

[23] 1 Tratado de Derecho Civil Español (Tomo II) 159 (2da. ed., 1953).

[24] 1 Comentarios al Código Civil Español 543, 620 (7ma. ed., 1956).

[25] *Op. cit.*, págs. 709–710.

[26] 1 Estudios de Derecho Civil (Tomo Quinto) 434, 539 (1912).

[27] 4 Tratado de Derecho Civil Español 148–149 (1938).

[28] "La [legislación] española (art. 144 del Código Civil) admite tan sólo el error sobre la identidad de la persona y de ningún modo sobre sus cualidades." *Op. cit.*, pág. 108.

[29] 1 El Código Civil 421 (1900).

nes sobre este género de error como vicio del consentimiento, capaz de anular el matrimonio, pero lo cierto es que son pocas las legislaciones que le otorgan cabida."[30] Apunta luego que Francia,[31] Italia y Méjico no lo aceptan mientras que Alemania y Suiza sí lo hacen.

Luisiana es el único estado de la Unión que expresamente reconoce el error en la persona como causa de nulidad. Siguiendo los precedentes franceses, también interpreta que ese error se refiere exclusivamente a la identidad de la persona. Arts. 91 y 110 del Código Civil; *Delpit* v. *Young*, 25 So. 547 (1899); *Stier* v. *Price*, 37 So.2d 847 (1949); 23 Tulane L. Rev. 582 (1949).

*Sexto:* El *error en la persona* como motivo de nulidad fue eliminado de la legislación puertorriqueña al llevarse a cabo la codificación de 1902 y nunca ha sido restituído. Muñoz Morales considera que se trata de una omisión motivada por "la prisa" de los legisladores al realizar la revisión del Código, quienes "no se fijaron en que tal circunstancia constaba en el Código Español, en el Código de Louisiana, en los Códigos francés e italiano y en el mismo proyecto que formuló aquella Comisión [Codificadora de 1902]."[32] Es posible que la explicación anterior sea correcta, pero varios factores militan en su contra. En primer lugar, se trata de una disposición muy importante sobre una materia esencial en el derecho de familia. Segundo, figuraba expresamente en el proyecto que la Comisión Codificadora sometió a los legisladores. Tercero, se eliminó también del segundo párrafo del art. 111 (179 del Código Revisado de 1902) relativo a quiénes pueden pedir la nulidad del matrimonio, a pesar de que también figuraba tanto en

---

[30] *Op. cit.*, pág. 108.

[31] Hay en Francia una corriente jurisprudencial liberalizadora de esta doctrina. Véase 3 Dalloz, *op. cit.* 359 (1953) donde también se señala que varios comentaristas favorecen esa corriente.

[32] Reseña Histórica y Anotaciones al Código Civil de Puerto Rico, pág. 203 (1947).

el Código español (art. 102) como en el proyecto de la Comisión Codificadora. Finalmente, los mismos legisladores de 1902 que eliminaron el error en la persona como causa de nulidad del matrimonio lo mantuvieron como causa de nulidad de los contratos—arts. 1232 y 1233 del Código de 1902, ahora arts. 1217 y 1218 del Código de 1930—según figuraba en los arts. 1265 y 1266 del Código español. En ausencia de otra prueba, estos factores nos inducen a creer que estamos frente a una eliminación deliberada y no frente a una omisión involuntaria causada por "la prisa". Además, aún cuando en su origen esta omisión hubiese sido involuntaria, resulta muy aventurado pensar que nuestros legisladores hayan mantenido "involuntariamente" y por más de medio siglo ese estado de derecho.

Trátese o no de una eliminación deliberada, el hecho indiscutible es que desde 1902 no existe en Puerto Rico el *error en la persona* como causa de nulidad del matrimonio y que así desapareció la única disposición que en el derecho histórico español y puertorriqueño hubiese permitido decretar la invalidez de un matrimonio por el error que recae sobre la identidad o las cualidades esenciales de uno de los cónyuges.[33]

### III

Considerando que la opinión disidente sugiere utilizar la jurisprudencia francesa como ejemplo para la nuestra, es necesario examinar, aunque sea brevemente, las circunstan-

---

[33] Es obvio que no describo la trayectoria histórica de nuestra legislación y la de sus precedentes españoles inmediatos para sobre esa única base dar por resuelta la cuestión planteada en este caso. Es ya demasiado tarde, desde luego, para permitir que el método de Savigny y sus seguidores rija con exclusividad nuestros procesos méntales. Pero la investigación histórica, si se utiliza con mesura, es un valioso instrumento para la interpretación de la ley y no cabe desdeñar su eficacia. "Como el Derecho es, en uno de sus aspectos, un producto histórico, hace falta saber lo que una institución ha sido en el pasado, para comprender bien su sentido presente y vislumbrar su porvenir." Castán, Teoría de la Aplicación e Investigación del Derecho (1947) pág. 105. Véase también Hernández Gil, Metodología del Derecho, (1945) págs. 65–100.

cias históricas ($^{34}$) dentro de las cuales se ha desarrollado esa jurisprudencia.

La Revolución de fines del siglo XVIII produjo, como en tantos otros aspectos de la vida institucional francesa, un cambio radical en la legislación sobre divorcio. No solamente se descartó el principio religioso de la indisolubilidad —"la facultad de divorciarse resulta de la libertad individual que se perdería por un compromiso indisoluble", decía la ley—sino que en la enumeración de las causas de divorcio se llegó al extremo de incluir el mutuo consentimiento y la incompatibilidad de caracteres. Más adelante, el Código Civil, aunque conservó el divorcio, eliminó la causa de incompatibilidad e hizo más difícil de obtener el divorcio por consentimiento mutuo. En 1816 se decretó por ley la abolición del divorcio al convertirse la fe católica en la religión del estado durante el gobierno de la Restauración. No fue hasta 1884 que pudo lograrse su restablecimiento y a partir de esa fecha se ha mantenido vigente, aunque habiéndosele hecho importantes modificaciones en los últimos años.

A la luz de ese historial afirman Planiol-Ripert que en Francia la institución del divorcio ha estado "ligada a la conquista de la libertad y al régimen político" y ha constituído motivo de apasionantes discusiones entre católicos y anticlericales. ($^{35}$) Esta condición, junto a otras tendencias sociales, ($^{36}$) explican, a mi juicio, la situación jurispruden-

---

($^{34}$) Véase 1 Planiol-Ripert, *Traité Elémentaire de Droit Civil*, 384 (3ra ed. 1946) ; 1 Colin y Capitant, Curso Elemental de Derecho Civil, 437–449 (1952) ; 1 Bonnecase, Elementos de Derecho Civil, 553–554 (1945).

($^{35}$) *Op. cit.*, pág. 386.

($^{36}$) Planiol-Ripert (*op. cit.*, pág. 387) mencionan las siguientes: el abandono de las creencias religiosas, la enseñanza de una moral que no se funda en el espíritu de sacrificio, el deseo de cada persona de hacer y deshacer su vida. Seguramente hay que añadir a éstas los profundos efectos que sobre la familia, y particularmente sobre la posición de la mujer, tienen que haber causado en Francia, como en los demás países modernos, el desarrollo económico, la industrialización, la urbanización, la educación en masa y el sistema democrático.

cial de ese país. Por un lado, el poder legislativo, seguramente por motivo de graves conflictos partidarios, ha producido una legislación profundamente influenciada por la concepción religiosa del matrimonio como vínculo indisoluble, la cual se manifiesta principalmente en el exiguo número de causas que enuncia como motivos de divorcio (adulterio, condena penal, sevicias e injuria grave).[37] Por otro lado, los jueces, al tener ante sí transformados en controversias judiciales los problemas diarios de la vida conyugal y los fermentos de una sociedad en proceso de cambio, han sentido, naturalmente, el efecto sofocante de esa legislación y han convertido a la causa de "injuria grave" en el vehículo útil para acomodar el estado de derecho a la situación social. Dicen a este respecto Planiol-Ripert: "Junto a los hechos precisos previstos por la ley, y que constituyen verdaderamente las causas determinadas de divorcio, uno encuentra una *fórmula general*, la *injuria*, que tiene el valor de un principio susceptible de aplicaciones indefinidas. Desde entonces todas las barreras han sido derribadas, y la verdad es que tenemos en Francia *un número ilimitado de causas determinadas de divorcio*. Han sido determinadas por la jurisprudencia y no por la ley."[38]

Y añade Fernández Clérigo: "Según acabamos de ver, en el Derecho francés el número limitado de causas de divorcio y los conceptos estrechos en que éste aparece encuadrado legislativamente han sido suplidos por una interpretación amplísima que la jurisprudencia ha hecho de la causa consistente en la injuria grave, desenvolviendo frondosamente

---

[37] Colin y Capitant, *op. cit.*, supra, págs. 445–496, describen la "laboriosa y hábil campaña" que frente a "protestas muy vivas" fue necesario realizar para lograr el restablecimiento del divorcio a fines del siglo XIX, y añaden: "Interesa notar la moderación acentuada a que tuvieron que reducirse los promotores de la reforma para que se admitiera el principio de ella . . . No hay duda de que el legislador de 1884, más aun que el de 1804, ha querido hacer del divorcio un remedio de excepción, que tribunales meticulosos conceden parcamente a hogares mal avenidos."

[38] *Op. cit.*, pág. 392. Énfasis de los autores.

178

una doctrina nacida del arbitrio judicial, en términos que tal vez indican una extralimitación.

"Sin embargo, fuerza es reconocer que en la mayoría de los casos, los tribunales franceses han sido impulsados por graves situaciones que la realidad les ha planteado y que no les era posible desatender." (39)

Orientada la jurisprudencia francesa hacia una interpretación prácticamente sin límites de la causa de "injuria grave", (40) fue tarea fácil incorporar a ésta la disimulación de hechos ocurridos antes del matrimonio. (41) Se ha perseverado en esa interpretación, y esta es, a mi juicio, la prueba definitiva del desequilibrio que existe en Francia entre la ley y la jurisprudencia, aun cuando en 1941 se enmendó el art. 232 del Código francés para disponer que la injuria debería consistir de una violación de los deberes y obligaciones "resultantes del matrimonio." No obstante esta fuerte indicación legislativa, los tribunales franceses continuaron interpretando la ley igual que lo habían hecho anteriormente y sosteniendo, por consiguiente, que la injuria

_____

(39) *Op. cit.*, pág. 132.

(40) Además de los hechos que más adelante se mencionan (escolio 44), los siguientes se han considerado como "injuria grave": el contagio voluntario de la sífilis, la negativa para recibir los parientes de la mujer, la negativa del marido para despedir o dejar que se despida a un criado que ha faltado a la esposa, la negativa del marido para que se bauticen los hijos comunes, la vigilancia abusiva ejercida sobre la correspondencia de la mujer o sobre la dirección interior del hogar, el silencio injurioso, el hábito del juego. Planiol-Tratado Elemental de Derecho Civil (1946) págs. 30–31. La ley francesa expresamente provee que la condena penal "aflictiva e infamante" es motivo de divorcio. No obstante, la jurisprudencia ha interpretado que una condena en la cual no se den esas dos condiciones puede constituir una "injuria grave" por la publicidad afrentosa que el hecho conlleva. La injuria consiste en no haber previsto la afrenta y en no haberla evitado absteniéndose de cometer el delito. 2 Dalloz, *op. cit.* 126.

(41) Conviene aclarar que aunque esta es la jurisprudencia dominante aprobada por la Corte de Casación, no hay unanimidad entre los tribunales franceses y tampoco entre los comentaristas. En 2 Dalloz, *op. cit.*, pág. 127 aparece una relación de las sentencias y los comentaristas que no aprueban la regla de la mayoría.

puede tener su origen en la disimulación de faltas anteriores al matrimonio. (42)

## IV

¿Debe asimilarse la situación francesa a la nuestra? Estimo que no. En primer término, el divorcio generalmente no ha sido en Puerto Rico motivo de discusiones apasionantes y mucho menos ha estado "ligado a la libertad y al régimen político." No es de nuestra competencia investigar porqué la institución ha sido tan generalmente aceptada en un país que es predominantemente católico. El hecho indiscutible es que, salvo algunas protestas esporádicas, hay una casi total conformidad de todas las clases sociales con las disposiciones legales prevalecientes y no ha habido tentativas serias para modificar su alcance.

En segundo lugar y utilizando la clasificación de Fernández Clérigo, (43) nuestra legislación, contrario a la francesa, pertenece al grupo de las que enumeran "prolija y detalladamente y por lo general de modo taxativo los motivos del divorcio." Autorizado inicialmente por una orden militar de 17 de marzo de 1899, el divorcio absoluto recibió su primera sanción civil en el art. 164 del Código Revisado de 1902, hoy art. 96. Ese artículo enumeraba ocho causas de divorcio, cinco tomadas del Código español (adulterio, condena penal, trato cruel e injurias graves, corrupción de los hijos y propuesta del marido para prostituir a su mujer) y tres del de

---

(42) Aubry y Rau, op. cit. 227 (1948); 2 Dalloz, op. cit. 127 (1952), donde también constan las opiniones encontradas de prestigiosos comentaristas franceses sobre el efecto de esta enmienda.

(43) "Para determinar las causas en que el divorcio llamado necesario puede fundarse, unas legislaciones siguen el sistema de enunciar una sola causa . . .; de citar un número reducido de aquellas causas dotándolas, a veces, de la suficiente elasticidad para comprender múltiples supuestos que en la vida conyugal pueden presentarse; o de enumerar prolija y detalladamente y por lo general de modo taxativo los motivos del divorcio." Al establecer esta clasificación Fernández Clérigo (pág. 130) considera a Inglaterra como ejemplo del primer sistema, a Francia, Suiza y Alemania como ejemplos del segundo, y del último a Panamá, Venezuela, Méjico, Cuba y la ley española del 1932.

Luisiana (embriaguez, abandono e impotencia). Luego, en 1937 se añadió la separación de ambos cónyuges por un período que fue primero de siete años y después—1942—se redujo a tres, y en 1938, la locura incurable. Estimo que la técnica legislativa de enumeración larga y detallada que se ha utilizado en nuestro país nos sugiere una interpretación más restrictiva de la ley de divorcio que la prevaleciente en jurisdicciones como Francia,(⁴⁴) Alemania y Suiza.(⁴⁵) Me parece razonable concluir que al tomarse el trabajo de establecer una larga lista de causas de divorcio, el legislador interesaba crear fórmulas más precisas y concretas que las que hubiesen resultado del método opuesto y reducir de esa manera el arbitrio judicial. Ese modo de legislar tiene especial pertinencia cuando se trata de incorporar a nuestro derecho, por vía de interpretación de una de esas causas, un motivo de divorcio de las enormes proporciones y la fundamental importancia del dolo, fraude o engaño. Asimismo, y continuando este examen analítico, no es de despreciar el hecho de que nuestra ley contiene una causa de las llamadas obje-

_____

(⁴⁴) Un examen de la jurisprudencia de Francia—2 Dalloz, *op. cit.* 117–127; Rau y Aubry, *op. cit.* 219–227; 1 Planiol-Ripert, *op. cit.* 396–400 —demuestra que los tribunales de aquel país en su interpretación de la causa de "excesos, sevicias e injurias graves" han adoptado como motivos de divorcio varias de las causas que en nuestra ley aparecen consignadas expresamente. El abandono o separación por uno de los cónyuges, la embriaguez y aún la pasión por el juego, la conducta brutal y corrupta hacia los hijos, la tentativa de prostituir a la mujer, la impotencia, si se ha ocultado o si el marido se niega a someterse a tratamiento médico, y en ciertas circunstancias la condena penal, han sido consideradas como injurias graves que hacen intolerable la vida conyugal. Por el contrario, no se han aceptado la impotencia incurable ni la locura sobrevenidas después del matrimonio.

(⁴⁵) En Alemania los jueces han utilizado la causa de "infracción grave de los deberes matrimoniales" del mismo amplio modo que se ha utilizado "la injuria grave" en Francia, aunque sin aplicarla, como señalamos anteriormente, a la disimulación de faltas anteriores al matrimonio. Fernández Clérigo, *op. cit.*, pág. 133; Kipp-Wolff, *op. cit.*, págs. 228–231. Lo mismo ha sucedido en Suiza con la disposición que permite "demandar el divorcio cuando el vínculo conyugal haya sido tan profundamente afectado que la vida común resulte intolerable." Fernández Clérigo, *op. cit.*, pág. 135.

tivas o inculpables—la separación por tres años—mediante la cual el legislador tuvo sin duda el designio de ofrecer un remedio para aquellas dificultades conyugales que no figuran específicamente en las otras nueve causas. ([46])

Finalmente, nuestros legisladores han prestado ejemplar atención al derecho de familia, particularmente en los últimos años. A partir de 1933 se han hecho siete enmiendas a las disposiciones sobre divorcio([47]) y tantas a las demás provisiones que afectan al régimen familiar que resultaría prolijo enumerarlas. ([48]) Aunque podría criticarse la acción legislativa por la ausencia de rigor científico en la incorporación de nuevas normas al Código Civil, ([49]) justo es reconocer que esa acción ha estado acoplada a los cambios sociales y se ha apoyado en generosos criterios de igualdad humana. Tal trayectoria culminó, como sabemos, en el Artículo I de la Constitución que prohíbe en la parte pertinente

([46]) Estoy también consciente de las graves limitaciones que sufre toda interpretación que se remite únicamente al texto de la ley y trata de fijar su significado mediante el uso exclusivo de procedimientos gramaticales y lógicos. Pero también en este caso Castán, con plena razón, nos advierte que "por muy humilde que sea la operación exegética, hay que reconocer que constituye la base y antecedentes indispensables de todo ulterior trabajo sobre el Derecho positivo y que no hay posibilidad de llegar a resultado científico alguno sino es partiendo de una recta inteligencia de los textos de la ley." Teoría de la Aplicación e Investigación del Derecho, pág. 83.

([47]) Tres de ellas se refieren a las causas de divorcio, las otras cuatro a diversos aspectos de procedimiento y a problemas de patria potestad, alimentos, etc. Véase Muñoz Morales, op. cit. págs. 93–104.

([48]) Muñoz Morales incluye en su libro una relación completa de las enmiendas introducidas al Código Civil desde principios de siglo hasta 1947, op. cit., págs. 44–121. De ellas por lo menos treinta y cinco afectan al régimen de la familia. En la última década se han hecho once enmiendas más. Véanse los volúmenes de Leyes de Puerto Rico de 1948—págs. 91, 203, 229; 1949—págs. 417, 545, 781; 1950—págs. 289, 667; 1952—pág. 921; 1953—pág. 305; 1958—pág. 122.

([49]) Considero un deber llamar la atención de los distinguidos legisladores del país hacia el estado deplorable en que se encuentra el Libro I del Código Civil desde el punto de vista de la ordenación científica y la claridad en la redacción. Una rápida lectura de los comentarios de Muñoz Morales es suficiente para darse cuenta que urge realizar una revisión que corrija esas graves deficiencias.

los discrímenes por motivo de sexo, nacimiento y origen o condición social. Esa fina sensibilidad legislativa hacia la institución de la familia, tantas veces comprobada en los últimos años, constituye otra razón para abstenernos de introducir cambios fundamentales en las normas jurídicas. Ante ese historial es preciso concluir que si el dolo, fraude o engaño no forman parte hoy de nuestra ley de divorcio o de nulidad es porque no ha habido exigencias sociales que así lo reclamen. ([50])

## V

Convengo en .que la interpretación judicial de las leyes no debe regirse exclusivamente por procesos lógicos o históricos y que, admítase o no, en toda ocasión en que surge la necesidad de escoger uno entre dos o más significados probables, el juez necesariamente utiliza factores valorativos. Acepto, igualmente, que en numerosas ocasiones el legislador está impedido de abarcar la realidad social por medio de fórmulas precisas y detalladas, y diseña entonces un principio amplio confiando en que, de conformidad con el fin de la ley, el arbitrio judicial ha de aplicarlo justicieramente a las infinitas variaciones que la vida continuamente provee. Nuestro derecho histórico, principalmente el Código Civil, contiene copiosos ejemplos de estos principios. El art. 1802 de ese Código, ([51]) que establece la responsabilidad por actos de acción u omisión, podría citarse, tal vez, como el mejor ejemplo. Al aplicar esas normas nace una ineludible responsabilidad judicial de adaptarlas, en lo posible, a las cambiantes condiciones de la sociedad, de insuflarles a cada instante,

---

([50]) No tenemos noticias de que en las últimas décadas se haya planteado a la Asamblea Legislativa la necesidad de enmendar la ley para añadirle la causa de dolo o fraude. Tampoco el asunto ha sido objeto de discusiones públicas. En las revistas profesionales sólo hemos podido hallar un breve comentario sobre el tema. Velázquez, ¿Puede Admitirse el Dolo como Causa de Nulidad del Matrimonio en Puerto Rico? 10 Rev. Jur. U.P.R. 449 (1941).

([51]) "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado."

sin violentar su letra y su propósito, una nueva dimensión que les permita seguir funcionando adecuadamente como reglas modeladoras de la conducta social.

Sin embargo, esa labor de adaptación no puede convertirse, aun en los casos de la más generosa delegación legislativa, en un proceso de creación pura. Al realizar esa tarea el juez ocupa, por imperativos del sistema, una posición subordinada a la del legislador. Este tiene la responsabilidad primaria de iniciar los cambios básicos en la política pública y de él reciben los jueces el mandato, unas veces preciso e inequívoco, otras, confuso e inexacto, al cual ha de ajustarse su interpretación. Tiene el juez, por consiguiente, que hacer parte esencial de sus juicios valorativos a esa concepción de su función tradicional y orientar su conducta en términos de la búsqueda de un significado y no de la creación independiente de una nueva o una mejor norma social.

Escribe uno de los más grandes juristas norteamericanos:

"La diferencia vital entre iniciar la política pública, que frecuentemente envuelve un rompimiento decidido con el pasado, y meramente poner en vigor una política ya formulada, señala los límites relativamente estrechos dentro de los cuales los tribunales pueden en justicia hacer una selección y el grado en que interpretar la ley es inevitablemente crear la ley. Decir, que, por razón de este campo limitado de declaración interpretativa, los tribunales hacen leyes igual que las legislaturas es negar rasgos esenciales de la historia de nuestra democracia. Es negar que la legislación y la adjudicación han seguido líneas distintas de crecimiento, sirven propósitos vitalmente distintos, funcionan bajo condiciones distintas y tienen responsabilidades distintas. . . . Aún en asuntos legales, algunas palabras y frases, aunque muy pocas, se asemejan a los símbolos matemáticos y significan sustancialmente lo mismo para todos aquellos que tienen ocasión de usarlas. Otros términos, como 'poder de reglamentación,' no son símbolos sino etiquetas para los resultados de

todo el proceso de adjudicación. En el medio queda una gama de palabras con diversas denotaciones y connotaciones. Hay para los jueces variados matices de compulsión en diferentes palabras, y esas diferencias se deben a las palabras mismas, a su colocación en un texto, a su ubicación en la historia. En resumen, los jueces no son glosadores independientes. Tienen el deber especial de no darle demasiado énfasis a los aspectos episódicos de la vida y de no subestimar sus procesos orgánicos—sus continuidades y relaciones. Por lo menos para los jueces, es importante recordar que la continuidad con el pasado no es sólo una necesidad sino aún un deber." (⁵²)

Otro jurista, igualmente notable, pero de entronque con el derecho civil, formula un pensamiento similar:

"El jurista, en conclusión, tiene que trabajar no sólo sobre leyes positivamente formuladas, sino también sobre principios y conceptos jurídicos al lado de apreciaciones y hechos sociales. Pero no saquemos de ellos consecuencias exageradas que pueden no avenirse con nuestro sistema jurídico. Va acaso demasiado lejos Puig Brutau cuando opina que el centro de gravedad de la creación jurídica, aun en los países de Derecho codificado, reside en la decisión de casos particulares y no en la formulación de normas generales, y cuando nos dice que el Derecho de juristas es la fuente primaria del Derecho objetivo. Conviene, frente a estas aventuradas conclusiones, que mantengamos a toda costa la sujeción del juez a la ley, o mejor dicho—puesto que ley y Derecho no son idénticos—a la ley y a los principios generales del Derecho. Hay, sí, creación jurídica en la sentencia judicial. Pero esta creación opera sobre presupuestos legales y jurídicos objetivos. Incumbe al juez o al jurista oficial una misión insustituible de individualizar el Derecho, integrarlo con soluciones nuevas y dentro de ciertos límites adaptarlo a la vida y rejuvenecerlo.

---

(⁵²) Félix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 534 (1947).

Pero esta misión no puede desvirtuar la que atribuyen a la ley aquellos ordenamientos jurídicos que como el nuestro descansan sobre la existencia de unas normas generales de Derecho positivo que han de ser aplicadas y adaptadas a los casos particulares. En definitiva, hay en nuestros sistemas jurídicos una formulación originaria y propiamente *creadora* del Derecho positivo, que corresponde al legislador, y una elaboración que podríamos llamar *reconstructiva* del Derecho, la cual operando con el Derecho positivo y también con el Derecho natural, corresponde a los jueces. No cabe subestimar a la una ni a la otra." ([53])

La interpretación de los preceptos legales amplios y flexibles presenta al juez su más formidable reto. Tiene, por un lado, que esforzarse en adaptar esos preceptos a las realidades prácticas de la vida social y esa adaptación necesariamente envuelve juicios valorativos. Por otro lado, tiene que hacerse cargo de su posición subordinada en el sistema y buscar afanosamente en la ley, la historia, los principios generales del derecho y los fundamentos del régimen político los hitos que marcan las fronteras de su discreción. Éstas no son, comprendo, categorías precisas, y el choque entre ambas en ocasiones específicas produce graves y angustiosas perplejidades. ([54]) La eficiencia del legislador en el uso de las palabras

---

([53]) Castán, La Formulación Judicial del Derecho, (2da ed. 1954) págs. 25–27. Énfasis del autor. Se han eliminado las citas.

([54]) En *Irizarry* v. *Pueblo*, 75 D.P.R. 786 (1954) se planteó a este Tribunal un problema de interpretación de alcance similar al que estamos considerando. La opinión disidente proponía se descartara la doctrina de "negligencia contribuyente" que había regido en Puerto Rico desde principios de siglo, por interpretación del art. 1802 del Código Civil, y que en su lugar se instalara la doctrina de "negligencia comparada". Al concurrir con el criterio mayoritario, opuesto a esa modificación, dijo el Juez Asociado, hoy Juez Presidente, Sr. Negrón Fernández: "Su adopción [de la doctrina de negligencia comparada] no estaría, a mi juicio, autorizada bajo el estado actual de nuestra legislación. La autoridad judicial no puede extenderse, en la interpretación de un estatuto, hasta la usurpación de funciones y poderes que residen en el poder legislativo . . . . .

"La materia que nos ocupa pertenece al ámbito de la política pública del Estado, la cual no corresponde al poder judicial formular. Yo creo en la necesaria evolución del derecho y en el reexamen y modificación de los

y su esmero en hacer evidentes los propósitos que le animan, lo mismo en la legislación que en las variadas fuentes que se incluyen bajo el rubro de "materiales legislativos", contribuyen poderosamente a reducir las dimensiones e intensidad de los conflictos. El juez, por su parte, necesita estar continuamente alerta a las diferencias básicas que existen entre la función judicial y la legislativa y debe tener una renuencia, "tanto instintiva como cultivada", [55] a confundirlas. [56]

Debo añadir que me parece en extremo aventurado afirmar que para resolver el problema que se nos plantea basta hacer uso *del* "método del derecho civil" y que es debido a *ese* "método" que los tribunales franceses han procedido de la manera que lo han hecho. Ningún método tiene esa cualidad mágica. Cierto es que la legislación civil se vale, con mucha mayor frecuencia que la angloamericana, de fórmulas y principios concebidos de manera amplia y flexible y desdeña, generalmente, la enumeración. [57] Cierto es, también, que esa técnica, dondequiera que se use, [58] tiene el efecto de ampliar

conceptos y doctrinas de la jurisprudencia, como función judicial necesaria para mantener en marcha continua de progreso los ideales de superación y de justicia del ser humano. Pero no puedo, a través de un proceso glorificador de la omnipotencia judicial, marchar a la conquista de la fortaleza legislativa." (Pág. 794.)

[55] Frankfurter, *op. cit.*, pág. 535.

[56] Las consideraciones que aquí he expresado sobre la interpretación de las leyes no son, desde luego, aplicables a la interpretación constitucional. Ésta se rige por otras normas, y al efectuarla el juez no ocupa una posición subordinada a la del legislador, aunque le debe, desde luego, profundo respeto a sus determinaciones.

[57] Vale recordar, como ya antes señalamos, que es precisamente al abordar el asunto que estamos considerando que varios países de derecho civil, entre ellos el nuestro, han abandonado la técnica tradicional para acogerse a la de la enumeración larga y detallada. Cuba tiene dieciocho causas de divorcio, Panamá once y Méjico diecisiete. La ley española de 1932 establecía trece causas. Fernández Clérigo, *op. cit.* pág. 135. Perú tiene diez causas. Castañeda, Código Civil (1955) pág. 85.

[58] Afirma Castán: "En la segunda de las grandes formas del Derecho inglés, la de las disposiciones legales (*Statute Law*), el problema de la interpretación y aplicación plantea problemas sustancialmente idénticos a los que la *lex scripta* suscita en el Continente. Los jueces ingleses, al igual que los nuestros, se ven obligados con mucha frecuencia, a realizar su función interpretativa, apartándose de la *litera legis* y recurriendo

el ámbito de la interpretación judicial. Pero aceptar estas realidades no significa resolver el problema de interpretación. Es, a lo sumo, un primer paso y el verdadero misterio queda por delante.

¿Qué debe hacer el juez una vez cruza ese dintel? ¿Reducirá su arbitrio exclusivamente a lo que le dicte la letra del precepto? ¿Irá más adelante para incluir elementos lógicos, sistemáticos, filosóficos, históricos, sociológicos, teleológicos? ¿Uno o varios? ¿Si varios, en qué proporción, con qué énfasis? ¿Hasta dónde ha de llegar al usarlos? ¿Dentro de la letra de la ley, de los principios generales del derecho? ¿Fuera o aún en contra de la ley y de tales principios? ¿Y cómo han de influir en sus fallos su propia formación intelectual y moral, su visión de la vida y de las gentes, su percepción de los ideales de la comunidad y del ordenamiento político, su sensibilidad hacia los cambios sociales, su capacidad de autolimitación? Éstos, y otros de la misma naturaleza, son los verdaderos interrogantes en la interpretación de la ley y no pertenecen exclusivamente a ningún sistema ni a ningún "método" de derecho. En el derecho civil las diversas posiciones que nacen de esas preguntas han tenido y continúan teniendo hábiles defensores.(⁵⁹) Las diferencias que hay en Francia entre el criterio expresado por la jurisprudencia de la Corte de Casación (apoyada por civilistas como Esmein, Vizioz, Aubry y Rau) y el criterio de civilistas como Laurent, Colin, Capitant, Planiol y Ripert se deben a su vez a las diferencias entre las contestaciones que unos y otros dan a las anteriores preguntas y no a que unos utilicen *el* "método del derecho civil" y otros no.

Es por las razones que ya he consignado que no puedo

a métodos superiores, históricos, lógicos y sistemáticos, tomando en consideración el sentido general y los fines generales de la ley." Teoría de la Aplicación e Investigación del Derecho, págs. 125-126.

(⁵⁹) Examínense en la ya citada obra de Castán las páginas 55-151 dedicadas a una elaborada discusión de "Las direcciones y escuelas metodológicas"; y en Bonnecase, *op. cit.* las páginas 117-176 en que se discuten "Las escuelas del derecho civil."

suscribir el análisis mediante el cual se incorpora el dolo, fraude o engaño a nuestra ley de divorcio. Ese análisis está concebido, a mi juicio, únicamente en términos de cuál es la mejor solución para el problema de acuerdo con una apreciación individual de las exigencias culturales y de la "justicia" del caso y no intenta desentrañar el significado de las palabras ubicándolas en la trayectoria jurídica, histórica y social que les da sentido. "Cuando la ley cae en el silencio podríamos decir, siguiendo la metáfora del poeta, que ese silencio está poblado de voces. Pero cuando el juez dicta su sentencia, no sólo es un intérprete de las palabras de la ley, sino también de sus voces misteriosas y ocultas." (⁶⁰) En este caso las voces del desarrollo histórico de los preceptos aplicables, de la técnica de redacción, de la ausencia de reclamos sociales, de la actitud vigilante del legislador, de la magnitud y complejidad del cambio propuesto, y de la reflexión sobre nuestras limitaciones institucionales para decretar tal cambio, (⁶¹) necesariamente me obligan, contra las que serían mis preferencias si mi función fuera la de legislar, a compartir el criterio de que nuestra ley no autoriza el dolo, fraude o engaño como causa de divorcio.

Por las razones expuestas en la opinión del Tribunal y por las que consigno en esta opinión, convengo en que debe revocarse la sentencia apelada.

---

(⁶⁰) Eduardo J. Couture, Introducción al Estudio del Proceso Civil (2da ed. 1953) pág. 70.

(⁶¹) Diversos caminos se abren ante el legislador al considerar este problema. Puede negarse a cambiar las normas existentes y así disponer que ninguna modalidad del dolo, fraude o engaño será causa legal para romper el vínculo. Si descarta lo anterior, puede circunscribir la solución a una modalidad específica—el embarazo antenupcial, una enfermedad contagiosa, la falta de virginidad en la mujer, etc.—o utilizar una fórmula amplia, como el dolo o el error. Ya opte por la regla específica o por la norma general tendrá entonces que calibrar los efectos sobre los cónyuges, los hijos y los bienes y decidirse por la solución de nulidad o por la de divorcio. Aún luego de hecha esta última selección, tendrá que prescribir reglas específicas para resolver el problema de los hijos, que como en el presente caso, se encuentren en el peculiar estado de ser legítimos por presunción (art. 113 del Código Civil), pero ilegítimos por no haber sido engendrados por el marido.

Opinión disidente del JUEZ PRESIDENTE SR. NEGRÓN FERNÁNDEZ.

A los sesenta y cuatro días de haber contraído matrimonio con la demandada, el demandante inició la presente acción. ([1])

Al declarar con lugar la demanda por la causal de trato cruel e injurias graves, el tribunal *a quo* hizo la siguiente determinación sobre los hechos.

"La prueba ha convencido al Tribunal que el 17 de agosto de 1953 Manuel Rosado Marzán contrajo matrimonio con Marcelina Rivera García; que cuando Marcelina se casó con Manuel ya estaba embarazada de otro hombre que no es el demandante; que el demandante se dio cuenta de esta situación e inmediatamente entregó a Marcelina a su padre explicándole el por qué de este rompimiento súbito. La demandada dio a luz el día 21 de febrero de 1954. Para agosto 17 de 1953, cuando se casó, ya estaba encinta y el padre de la criatura no era precisamente Manuel Rosado Marzán, persona ésta que había llegado de servir al Ejército en Alemania el 24 de junio de 1953."

Comparto el criterio del Tribunal en el sentido de que no procede, bajo el estado actual de nuestro derecho, la acción de divorcio en este caso. Aunque la opinión del Tribunal deja abierta y no prejuzga la cuestión de si procede o no la acción de nulidad, estimo que conforme a las alegaciones de la demanda y la prueba pasada, la controversia ante el tribunal

---

([1]) En demanda enmendada alegó lo siguiente:

"PRIMERO: Que el demandante y la demandada contrajeron matrimonio en Toa Baja, Puerto Rico, el día 17 de agosto de 1953 y desde entonces se encuentran legalmente casados.

"SEGUNDO: Que en dicho matrimonio los cónyuges no han procreado hijos, ni han adquirido bienes de clase alguna.

"TERCERO: Que la demandada al casarse con el demandante se encontraba en estado de embarazo de otro hombre, ya que el demandante no había tenido relaciones sexuales con la demandada hasta el momento del casamiento y la demandada dio a luz el 20 de febrero de 1954 exactamente seis (6) meses tres (3) días después de la fecha de haber contraído matrimonio.

"CUARTO: Que esta actuación de parte de la demandada para con el demandante al engañarlo en esta forma le ha ocasionado serios desajustes emocionales y espirituales ya que la demandada a quien él creía una mujer virgen en el momento del matrimonio resultó en estado de embarazo para esa fecha."

sentenciador giró realmente sobre la nulidad del matrimonio, y que la acción se convirtió efectivamente en una de nulidad.

La naturaleza especial del contrato matrimonial y el interés público de que está revestido, lejos de hacer inaplicable al mismo la doctrina general que informa el Código Civil relativa al vicio del consentimiento en los contratos, por dolo o fraude —consistente aquí en la ocultación por la mujer de su estado de embarazo debido a relaciones sexuales con otro hombre— exige a mi juicio su más estricta aplicación, para no subvertir la razón lícita en que se funda la institución del matrimonio que de él se deriva. Esa ocultación constituye en sí misma, por su propia e inherente condición fraudulenta, un vicio de índole moral que el Estado no puede dar por bueno para crear la institución fundamental de nuestra sociedad.

El contrato matrimonial es el contrato de más alta categoría en el orden jurídico y social establecido, que engendra las obligaciones recíprocas de mayor significación para la sociedad constituída. Es de derecho público, porque está intervenido por el Estado, y cuando a ese contrato da su consentimiento un hombre, de buena fe, llevado por la conducta dolosa de la mujer que oculta un estado de embarazo prenupcial que él no ha creado, ese contrato ofende la moral y desde su incepción queda herida de muerte la institución matrimonial que propende a levantar, porque lleva en su propia entraña el vicio del engaño. El matrimonio así nacido no sería una institución, sería un escombro. El fondo moral que como esencia de toda relación jurídica contractual inspira los principios generales del Código Civil, y que no puede estar ausente en las convenciones ordinarias de tipo patrimonial, no puede dispensarse en una convención regida, como el contrato especial de matrimonio, por el reclamo imperativo de lo honesto. El Estado no puede auspiciar una institución que nace en ruinas, que procede de un contrato maculado en su intrínseco valor social por el germen del fraude, que no puede generar confianza, que desvirtúa el propósito de su creación y niega su verdadera esencia como órgano de utilidad social.

El silencio del derecho positivo (²) en el articulado relativo al matrimonio, en cuanto al dolo o fraude como causa de nulidad, no debe interpretarse en el sentido de impedir el ejercicio de esa acción, en un caso como el presente. A los principios generales del derecho, inspirados en el sentido moral de la ley, hay que acudir por mandato del art. 7 de nuestro Código Civil, que es base jurídica suficiente para la acción de nulidad de un matrimonio que la sociedad y la ley no pueden imponer, porque niega los propios fines de su creación, y establecería una relación jurídica sin objeto social útil.

En consecuencia, bajo la determinación del tribunal a quo sobre los hechos, la sentencia debería a mi juicio modificarse, sustituyéndose el pronunciamiento sobre disolución del vínculo por el de nulidad de matrimonio, y así modificada, confirmarse.

---

Opinión disidente del JUEZ ASOCIADO SR. SALDAÑA.

A poco que analicemos el fallo emitido por el Tribunal en este recurso, advertiremos su significación: con absoluta impunidad, la mujer puede ocultar fraudulentamente a su marido un hecho de tanta importancia y gravedad como su estado de embarazo antenupcial por otro hombre. Frente a conducta semejante no existiría ningún recurso legal para el marido. En primer lugar, no procede decretar el divorcio que éste solicitó en su demanda. Aunque parezca sorprendente, no puede invocarse el motivo de "trato cruel o injurias graves" porque se considera la ocultación como un hecho *anterior* al matrimonio. Por otro lado, el Tribunal resuelve de

---

(²) Felipe Clemente de Diego, El Silencio en el Derecho (1925) 97:

"En efecto, el mismo Código Civil, en su art. 6º [art. 7 de nuestro Código Civil] señala al Juez el camino a seguir cuando no haya ley exactamente aplicable al punto controvertido y como invoca en último término los principios generales de derecho como fuente e inspiración de soluciones jurídicas, no se alcanza la razón de excluir las materias relativas al silencio de ese procedimiento de integración y ampliación del orden jurídico. En caso de silencio será posible, pues, en principio, elevarse a la contemplación de esos criterios generales de justicia que puedan dar la pauta en la resolución de los casos no previstos en el Código.

un modo implícito que tampoco cabe la anulación del matrimonio, ni por error en la persona ni por el dolo de la mujer. Así, cuando menos legalmente, al marido no le queda otro remedio que proseguir su vida matrimonial de siempre.

Pero ¿es esto de verdad así? A mi entender resulta imposible admitirlo. La disimulación fraudulenta del embarazo anticipado es un acto de la mujer que vulnera en su esencia la relación conyugal. Sin duda la ocultación comenzó antes del matrimonio. Pero también fue coetánea a la celebración del mismo, e importa subrayarlo, continuó durante varios meses después. Esto implica que se trata estrictamente de un acto *posterior* al matrimonio que hiere gravemente el honor y los sentimientos del marido. Su resultado inevitable es la imposibilidad de toda convivencia entre los cónyuges. Y es forzoso reconocer que también destruye los fines que, en rigor, son esenciales al matrimonio. Lo cual significa, a mi juicio, que esa conducta de la mujer constituye una "injuria grave" y, por tanto, es causa suficiente en el orden jurídico para motivar el divorcio a tenor del art. 96 de nuestro Código Civil. 31 L.P.R.A. sec. 321. En verdad dudo mucho que en Puerto Rico hoy día se aplique en materia de divorcio la máxima del *caveat emptor*, con el rigor que de antaño tenía en el derecho mercantil, o el cínico aforismo de que "en el matrimonio engaña el que puede". Así pues, me veo precisado a discrepar de la opinión expresada por la mayoría.

"La buena fe, alma del comercio general de la vida y del comercio en sentido estricto, que ha de presidir la convivencia social y sus actos todos, buena fe invocada con frecuencia al respecto de los contratos en los Códigos civil y mercantil; las justas injunciones de la ley que pone un límite a la autonomía privada reconociendo el imperio justo del orden social y el respeto a las bases esenciales de la constitución y existencia de éste, entre las que ya se cuentan la buena fe, el sentido ético, las buenas costumbres . . . ; la exigencia de la causa en los contratos que ha de ser lícita; suministran datos y elementos bastantes para la admisión de los principios relativos al silencio como a tantas otras nuevas doctrinas, por ejemplo, el abuso del derecho que están reclamando un puesto y una consagración en nuestra legislación positiva."

Hace más de medio siglo que existe en nuestro derecho el concepto elástico de "injurias graves" como causa del divorcio. Se refiere, en términos generales, a una violación seria de los deberes recíprocos nacidos del matrimonio o a una ofensa grave a la dignidad de un cónyuge. Establece lo que Pound llama una "norma flexible" (*standard*) y Stone con más precisión califica como una "categoría de referencia indeterminada". Véanse Pound, *An Introduction to the Philosophy of Law*, (ed. rev. 1954) 57–59 y Stone, *The Province and Function of Law*, (1950) 185–186. En efecto, los actos injuriosos son de naturaleza y de forma tan diversas que sería inútil tratar de consignarlos de antemano en la ley. Además no existe ninguna medida o escala específica para apreciar su gravedad. Por eso la ley sólo establece una directiva general de "injurias graves", que en realidad permite englobar un sinnúmero de causas concretas de divorcio. ¿Podría el legislador prescindir de ese precepto y redactar un catálogo de las injurias entre esposos, en el cual exista un coeficiente de gravedad para cada categoría en la lista y un requisito de cierto total de puntos, o cierto promedio por año, para que uno de los cónyuges tenga derecho al divorcio? Evidentemente, no. El legislador tiene que recurrir, por necesidad inexorable, a una directiva flexible e incompletamente formulada, depositando así su poder normativo en manos de los jueces. Adrede se deja a éstos un amplio margen de discreción ". . . para decidir (cada) caso teniendo en cuenta todas las circunstancias del mismo, realizando aquella justicia individualizada y humana que no es otra cosa que la equidad". Castán, La Formulación Judicial del Derecho, (2a ed. rev. 1954) 108.

Así pues, la norma flexible de "injurias graves" como causa de divorcio tiene por función realizar la adaptabilidad del derecho a la vida y la consiguiente individualización de sus soluciones. Su aplicación permite y exige ante todo un juicio ético sobre la conducta humana. Para resolver si existe "injuria grave" en un caso concreto, los jueces no pue-

den prescindir del sentimiento de justicia que es parte de las convicciones o creencias que de hecho actúan sobre las gentes en una sociedad. La letra del precepto legal no tiene suficiente sentido sin ese juicio de valor complementario. O sea que sólo utilizando todos sus conocimientos, adquiridos por la experiencia, pueden los jueces determinar si ésta o aquella conducta constituye o no un comportamiento normal y típico de los cónyuges. En última instancia, su decisión siempre depende del sentido común que les indica lo que es "justo" según las convicciones colectivas predominantes. Esto no quiere decir, claro está, que la decisión judicial sea libre o arbitraria. Al contrario: el juez debe ser neutral y su valoración tiene que ser objetiva. Pero la neutralidad sólo significa impartir justicia a conciencia, descartando opiniones o predilecciones personales y evitando desviaciones de otro tipo. No significa indiferencia ante el problema ineludible de valoración que se plantea cuando el orden jurídico reglamenta la conducta de los cónyuges mediante el concepto flexible de "injurias graves." Véanse Castán, Teoría de la Aplicación e Investigación del Derecho, (1947) 171–173; Cossio, El Derecho en el Derecho Judicial, (1945); Recaséns Siches, Nueva Filosofía de la Interpretación del Derecho, (1956) 204–291; Cahn, *The Sense of Injustice*, (1949) 3–50.

De ahí que sean inaceptables tanto el razonamiento como la solución de la opinión de la mayoría. A mi juicio, tomando en cuenta las convicciones sociales sobre el sentido y alcance de la "injuria grave", como norma modeladora de la conducta de las gentes en Puerto Rico, el marido tiene derecho a obtener el divorcio en el caso de autos. La mujer no puede dejar de revelar al marido un hecho de naturaleza tan grave como su embarazo antenupcial por otro hombre. Naturalmente, para que exista una "injuria grave", es imprescindible que ese hecho haya sido ocultado o disimulado de mala fe, es decir, mediante dolo o fraude. Además, como no se puede disimular lo que todo el mundo conoce, tampoco procedería decretar el divorcio si el hombre aceptó contraer matrimonio cuando el

embarazo era notorio. Pero en este caso que ahora nos toca resolver: 1°, Se trata de una ocultación dolosa y premeditada del estado de embarazo antenupcial. 2°, El marido de hecho ignoraba por completo esa situación. 3°, El embarazo de la mujer por otro hombre no era notorio de suerte que hubiese debido conocerse. 4°, La disimulación culposa de la mujer comenzó antes del matrimonio, continuó durante la celebración del mismo y siguió hasta que varios meses más tarde el marido descubrió el engaño. Así pues, la mujer cometió un acto que sin duda constituye una ofensa muy grave a la dignidad de su marido. Y una vez que éste averiguó el engaño, ¿es posible humanamente la vida marital? o ¿subsisten en algún modo los fines del matrimonio? Nuestras costumbres y creencias sociales lo impiden. Y en verdad no hace falta un estudio sociológico para captar dichas convicciones vigentes en nuestro contorno social. Basta el espíritu de observación.(1)

No hay duda que las injurias graves sólo pueden fundarse en actos cometidos con posterioridad al matrimonio o, por lo menos, simultáneamente con la celebración del mismo. En efecto, antes del matrimonio no puede haber ofensa *contra un cónyuge* ni violación de las obligaciones *entre los cónyuges*. Pero aquí no se trata del acto de la mujer que es en rigor anterior al matrimonio: haber tenido relaciones sexuales con otro hombre y haber quedado encinta de él. El acto injurioso en este caso lo constituye la ocultación fraudulenta y el engaño prolongado sobre el embarazo anticipado. Esa ocultación y ese engaño comenzaron antes del matrimonio, pero también fueron coetáneos a su celebración. Más aún: continuaron durante varios meses después del casamiento. Y también hay que considerar como una injuria grave la ulterior revelación al marido de ese embarazo. De modo que la forma especial

---

(1) Sin embargo, véanse Steward y otros: *The People of Puerto Rico, A Study in Social Anthropology,* (1956) 10–16; 143–148; 158–160; 218–224; 291–294; 375–382; 440–446; 474; Stycos, *Family and Fertility in Puerto Rico,* (1955); capítulos V y VI.

de injuria cometida por la mujer en el caso de autos es lógicamente posterior al matrimonio.

Ahora bien, ¿podría argumentarse que la solución jurídica adecuada es la nulidad del matrimonio (1) por error en la persona, o (2) por el dolo de la mujer? La ley en Puerto Rico no admite esas causas de nulidad del matrimonio. Arts. 69 a 77 del Código Civil (ed. 1930), 31 L.P.R.A. secs. 232 a 245. Como señala Muñoz Morales: "Parece que, en la prisa de su revisión, los legisladores de 1902 se olvidaron de incluir *el error en la persona* como una de las circunstancias que vician o anulan el consentimiento; y no se fijaron que tal circunstancia constaba en el Código Español, en el Código de Louisiana, en los Códigos francés e italiano, y en el mismo proyecto que formuló aquella Comisión [Codificadora]; por tanto, en el Código Civil de Puerto Rico no figura hoy *el error en la persona* como circunstancia que afecta al consentimiento y a la validez del matrimonio". Reseña Histórica y Anotaciones al Código Civil de Puerto Rico—Libro Primero, (1947) 203. Así, no puede suscitarse en Puerto Rico el problema de si en el "error en la persona" caben el error sobre la identidad y además el error sobre las cualidades de la persona que pueden considerarse esenciales "dentro de la estimación dominante en la esfera social de los contrayentes". Castán, Derecho Civil Español, Común y Foral, tomo V, vol. I (7a ed. 1954) 129. Cf. 4 Espín Cánovas, Manual de Derecho Civil Español, (1956) 46. Por otro lado, al matrimonio no le son aplicables los vicios del consentimiento que rigen para los contratos ordinarios. Arts. 1217–1222 del Código Civil (ed. 1930), 31 L.P.R.A. secs. 3403–3421. Y el legislador ha establecido en forma taxativa los siguientes vicios del consentimiento en materia de matrimonios: ". . . 1. Cuando sea dado al raptor por la raptada, mientras ésta no haya recobrado por completo su libertad; 2. Cuando sea obtenido por violencia o intimidación". Art. 73 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 241. De ahí que el dolo de la mujer tampoco prive de validez al matrimonio. Cf. 1 Colin y Capitant, Curso

Elemental de Derecho Civil, (trad. esp. 3a ed. 1952) 375–405; y Velázquez, ¿Puede Admitirse el Dolo como Causa de Nulidad del Matrimonio en Puerto Rico?, 10 Rev. Jur. de la U.P.R. 449 (1941).

Una situación similar existe en Francia. Allí el dolo por disposición de ley no se admite como causa de nulidad del matrimonio. Y además el embarazo antenupcial por otro hombre no se considera como un "error en la persona" que vicia el consentimiento. Para comprobarlo basta citar el siguiente resumen del derecho francés: "Los tres vicios del consentimiento que por derecho común pueden entrañar la anulación de un contrato son, como es sabido, el error, la violencia y el dolo . . . . En materia del matrimonio resulta que, según el artículo 180 [del Código Civil Francés], puede atacarse el matrimonio, ya porque uno o los dos esposos no han emitido libremente el consentimiento, y por tanto, han sufrido *violencia*, ya porque ha habido *error*. Por consiguiente, se observará enseguida que de los tres vicios del consentimiento, el texto omite uno, el *dolo*. Este silencio es intencionado. Una tradición secular se opone a que uno de los esposos pueda atacar el matrimonio que ha contraído, alegando que su consentimiento fue sorprendido por los artificios y las maniobras fraudulentas de su cónyuge." 1 Colin y Capitant, Curso Elemental de Derecho Civil, (trad. esp., 3a ed. 1952) 375. Respecto al *error* dichos autores exponen lo siguiente: "No puede tratarse aquí evidentemente más que de error *sobre la persona*. Es el previsto por el artículo 180, párrafo segundo. Falta saber qué debe entenderse por tal . . . . Nuestra jurisprudencia, siguiendo la tradición de los Tribunales eclesiásticos, admite . . . [además del error relativo a la identidad física] que puede haber error . . . cuando se está equivocado sobre la *cualidad esencial* de la persona. Pero ¿cuál es ésta cualidad esencial? Sólo puede tratarse, dicen nuestros Tribunales, del estado de familia del individuo, o como se dice también de su *identidad civil;* por ejemplo, si uno de los cónyuges se atribuye un nombre falso o un falso estado civil

para hacer creer al otro que pertenece a una familia a la que en realidad es extraño. Pero cualquier error relativo, por ejemplo, a la integridad física, moral y aún judicial del individuo, no se considera como error acerca de la persona a tenor del artículo 180." *Ibid.*, 376–377.(²)

Resulta, por consiguiente, muy significativo que la jurisprudencia de los tribunales y la doctrina de los civilistas franceses hayan considerado como causa de divorcio la ocultación dolosa por parte de la mujer de su embarazo antenupcial, interpretando una disposición de ley relativa a "injurias graves" que es idéntica a la que se consigna en el inciso 4 del art. 96 de nuestro Código Civil. Adviértase que, si bien en España el divorcio significaba la mera separación personal de los cónyuges y no la disolución del vínculo, el origen de la causal de trato cruel o injurias graves en Puerto Rico se encuentra en la Ley Española del Matrimonio Civil de 1870 ("malos tratamientos graves de obra o de palabra inferidos por el marido a la mujer") y en el art. 105 del Código Civil Español de 1889 ("los malos tratamientos de obra, o las injurias graves"). A su vez la legislación española fue tomada del art. 231 del Código Civil Francés que se refiere a "excesos y sevicias graves, e injurias graves". Véanse 4 Valverde, Tratado de Derecho Civil Español (4a ed., 1938) 188 y sigtes; 1 Manresa, Comentarios al Código Civil Español, (7a ed., 1956) 628–633; y Puig Peña, Tratado de Derecho Civil Español, tomo II, vol. 1 (1953) 516 y sigtes. En Francia, ". . . comete una injuria grave (en materia de divorcio) la mujer que ha ocultado a su marido su estado de embarazo antenupcial . . .". Josserand, Derecho Civil, tomo I, vol. 2 (trad. esp. 1950) 150–151. O sea, como se ha dicho también, " . . . los hechos injuriosos deben ocurrir en principio después de la celebración del matrimonio. Sin embargo, la mayoría

---

(²) Véase sobre dichas cuestiones la exposición más detallada que aparece en 2 Planiol y Ripert, *Traité Pratique de Droit Civil Francaise*, (2a ed. 1952) 86–97; 3 Dalloz, *Encyclopedie Juridique–Repertoire de Droit Civil*, (1953) 356–359; y 1 Marty y Raynaud, *Droit Civil*, (1956) 556–560.

de los autores admiten que hechos anteriores al matrimonio tales como la conducta inmoral de la mujer o su estado de embarazo pueden, si han sido escondidos al marido, constituir una injuria grave. En ese caso no es tanto el acto anterior sino el silencio que guarda su autor que constituye la injuria. Es el engaño prolongado hasta el momento del matrimonio que se considera injurioso." 1 Ripert y Boulanger, *Traité Elementaire de Droit Civil de Marcel Planiol*, (3a ed., 1946) 400. Se señala con razón que, si el marido hubiese conocido el estado de embarazo antes de la celebración del matrimonio, no hubiera contraído el vínculo. (3) Así pues, la experiencia de los juristas, en un sistema de derecho civil que contiene reglas sobre nulidad del matrimonio y causas de divorcio que son muy similares a las nuestras, confirma el resultado de nuestro análisis anterior respecto al significado de la "injuria grave" como motivo suficiente para decretar el divorcio.

En cambio, la legislación en los Estados Unidos sobre este particular, es obviamente muy distinta a la nuestra. Por eso no podemos limitarnos a examinar la jurisprudencia estadounidense para determinar si la ocultación del embarazo antenupcial debe considerarse como una "injuria grave". Las leyes de algunos estados disponen expresamente como causa de divorcio el embarazo anticipado por otro hombre. 2 Vernier, *American Family Laws*, (1932) 70. En otros estados el "fraude" es motivo de divorcio y se ha resuelto que la disimulación del estado de embarazo anterior a las nupcias constituye "fraude". *Lyman* v. *Lyman*, 97 Atl. 312 (Conn. 1916); *Kissell* v. *Kissell*, 60 A.2d 834 (Pa. 1948). Pero en la in-

---

(3) La doctrina aludida se expone y analiza en: Civ. 7 mayo 1951, (Dalloz 1951. J. 472); Civ. 5 julio 1956, (Dalloz 1956. J. 609); 49 *Rev. Trimestrielle de Droit Civil*, 505 (1951); 57 *id.* 585–586 (1958); 2 Planiol y Ripert, Tratado Práctico de Derecho Civil Francés, (trad. esp. 1939) secs. 518 y 531; 2 Dalloz, *Encyclopedie Juridique—Repertoire de Droit Civil*, (1952) 113–128; 7 Aubry y Rau, *Droit Civil Francais*, (6a ed., 1948) sec. 476; 2 Planiol y Ripert, *Traité Pratique de Droit Civil Francais*, (2a ed. 1952) secs. 518 y 531; Juillot de la Morandiere, *Traité de Droit Civil de A. Colin et H. Capitant*, tomo I (1957) secs. 1140–1142; y Carbonnier, *Droit Civil*, tomo I (1957) sec. 128–B.

mensa mayoría de los estados dicho embarazo constituye *causa para anular el matrimonio.* Kingsley, *Fraud as a Ground for Annulment of a Marriage,* 18 So. Cal. L. Rev. 213 (1945) ; Vanneman, *Annulment of Marriage for Fraud,* 9 Minn. L. Rev. 497 (1925) ; Kingsley, *What are the Proper Grounds for Granting Annulments?* 18 Law & Contemp. Prob. 39 (1953). La única excepción, por cierto irracional, es que no procede anular el matrimonio si el marido *también* tuvo relaciones sexuales con la mujer antes del casamiento, aunque se demuestre que él no es padre de la criatura. Se aduce lo siguiente: "Aquél que a sabiendas se baña en un arroyo infestado, contribuyendo deliberadamente a la contaminación de sus aguas, no tiene razón para quejarse del carácter o gravedad de la corrupción original". *Bahrenburg* v. *Bahrenburg,* 150 N. Y. Supp. 589, 592 (1914). Cf. Cahn, *The Moral Decision,* (1955) 94–110. En todo caso, nos damos cuenta por qué resulta innecesario en los Estados Unidos decidir si la ocultación del embarazo antenupcial constituye "crueldad física o mental extrema". Esta última causa de divorcio existe en 43 estados y corresponde a nuestro "trato cruel o injurias graves." Véase Vernier, *op. cit. supra,* 24–31.

La doctrina jurídica que en este caso concreto justifica decretar el divorcio, sin duda podría invocarse si se tratase de la ocultación dolosa de otros hechos graves. Así por ejemplo: la falta de virginidad de la mujer, el homosexualismo del marido, la existencia de un hijo nacido fuera del matrimonio, la enfermedad venérea de un cónyuge, etcétera. Pero no hay dificultad práctica ni reparo jurídico en esto. A los jueces correspondería determinar en cada caso si existe o no "injuria grave", aplicando los criterios o requisitos que aquí hemos examinado someramente. Debido a la imposibilidad de una legislación exhaustiva es que se recurre a la norma flexible de "injurias graves" como causal de divorcio. Y ésta tiene por función precisamente: (1) abarcar las infinitas variaciones que pueden asumir los actos injuriosos entre esposos; y (2) fijar como índice revelador de la gravedad de la injuria

—que le otorga trascendencia para constituir motivo de divorcio—la imposibilidad de toda convivencia marital y la destrucción de los fines esenciales del matrimonio. O sea, que la tarea del juzgador bajo la doctrina de este caso es idéntica a la que desempeñan desde hace más de medio siglo los tribunales en Puerto Rico sin disonancias ni abusos. La única diferencia es que la aplicación del criterio de injuria grave en pleitos de divorcio, se extiende a actos de los cónyuges que *empiezan antes* del matrimonio. No hay posibilidad de ahorrar a los jueces ese trabajo mediante cánones establecidos en sus mínimos detalles. Lo mismo ocurre con los hechos injuriosos que *empiezan después* del matrimonio. Por supuesto, la aplicación consciente y articulada de normas flexibles es un proceso penoso, a veces lancinante para la mente y el corazón. Pero no queda más remedio que hacer nuestra faena auténtica. Lo demás es ensueño que, como dice Ortega, es el "hueco de la acción ausente". Y la experiencia nos demuestra que los tribunales en Puerto Rico sabrán ir resolviendo estos problemas sobre la "injuria grave" a medida que vayan surgiendo.

Obviamente no se trata aquí de conceder divorcios sin fundamentos serios. Los requisitos para que la ocultación dolosa de un hecho constituya "injuria grave" son en verdad muy estrictos. Por eso sería un error suponer que la extensión de la injuria grave a estos casos pondría en crisis el matrimonio o contribuiría a la disgregación de la familia en Puerto Rico. En términos estadísticos, el "trato cruel o las injurias graves" fue la causal en menos de una cuarta parte del total de los divorcios decretados en Puerto Rico durante la última década. En cambio, la separación por el período de tres años o más, y el abandono son las causales de divorcio principales: por ejemplo, en 1956 más de un 76% del total de los divorcios en Puerto Rico se fundaron en dichas causales. Véanse los Informes Anuales del Secretario de Salud para los años de 1947 a 1956. El peligro no es conceder el divorcio allí donde se halla sancionado o justificado, sino la práctica

de la *colusión* para obtener la disolución del vínculo. Este abuso no puede conducir a la conclusión de que el divorcio debe ser suprimido en los casos de ocultación fraudulenta de un hecho que vulnera en su esencia la relación conyugal. Lo que procede es extremar el celo de los tribunales para evitar las simulaciones o colusiones que en realidad provocan la ruptura por *consentimiento mutuo* de los esposos. (⁴)

A fin de evitar confusiones, debe consignarse que sólo hemos recurrido a la jurisprudencia y a la doctrina francesas "por vía de instructivo antecedente", como hace Scaevola en su tratado. Código Civil, tomo II (5a ed. 1946) 784–787. Claro está que las convicciones sociales predominantes en Francia no pueden aceptarse ni aplicarse sin más análisis. En cada caso habría que determinar lo que constituye una "injuria grave" *en el contorno social puertorriqueño*. Pero en cuanto a la ocultación dolosa del embarazo antenupcial por otro hombre, en las circunstancias concretas que presenta el caso de autos, nuestras creencias sociales vigentes coinciden con aquéllas que mueven el derecho francés a calificar semejante conducta como una "injuria grave" que es motivo de divorcio. Por otro lado, ya señalamos *la base jurídica* que nos permite acudir al derecho francés como fuente de experiencia para juzgar la cuestión que ahora nos confronta.

El amplio desarrollo de la noción de injurias graves en la doctrina francesa no debe atribuirse a que el legislador, por motivo de conflictos políticos y religiosos, no pudo hacer una enumeración prolija de causas determinadas de divorcio. Esta explicación ignora por completo lo esencial: la técnica legislativa y el método jurídico vigentes en los países de dere-

---

(⁴) Cabe señalar que no es del todo clara la relación entre las reglas jurídicas sobre el divorcio y los fenómenos sociales que a veces se incluyen bajo las categorías de "desorganización de la familia" e "inestabilidad del matrimonio". Véanse Rheinstein, *The Law of Divorce and the Problem of Marriage Stability*, 9 Vand. L. Rev. 633 (1956); Llewellyn, *Behind the Law of Divorce*, 32 Col. L. Rev. 1281 (1932) y 33 *id.* 249 (1933); Hankins, *Divorce* en 5 *Encyclopedia of the Social Sciences*, 177–185; Baber, *Marriage and the Family*, (1953); y Burgess and Locke, *The Family*, (2a ed. 1953).

cho codificado. El Código Civil francés, señala Radbruch, no tiene "... una redacción casuística ..." ni se halla "... dominado por la quimera de resolver de antemano, mediante exageradas abstracciones, todos los casos jurídicos imaginables ..."; por el contrario, "... renuncia conscientemente a la pretensión de reglamentarlo todo, sin omisiones ni lagunas ..." Introducción a la Filosofía del Derecho, (1951) 75. O sea que, lejos de tener una técnica legislativa a base de fórmulas prolijas y estrechas, como la que predomina en los países angloamericanos, el derecho civil francés posee una técnica legislativa a base de fórmulas breves, amplias y flexibles. Es decir, se vale de conceptos, principios, normas e instituciones generales que tienen la virtud de no perderse en los detalles de reglas rígidas, estrechas y casuísticas. Como indicaba Portalis, uno de los redactores del Código francés, en su famoso discurso sobre el título preliminar ante el Parlamento: "Saber que no es posible preverlo todo, es una sabia previsión". Y reconocía que: "Hágase lo que se quiera, jamás las leyes podrán reemplazar enteramente el uso de la razón natural en los negocios de la vida. Las necesidades de la sociedad son tan varias, el comercio entre los hombres es tan activo, los intereses son tan múltiples, sus relaciones tan extensas, que es imposible al legislador preverlo todo. En aquellas mismas materias en que el legislador pone su atención, hay una multitud de detalles que se le escapan o que son demasiado cuestionables y variables para ser objeto de una norma legislativa. Además, ¿cómo suspender la acción del tiempo? ¿Cómo oponerse al curso de los acontecimientos o variar el rumbo de las costumbres? ¿Cómo conocer y calcular previamente lo que sólo la experiencia nos da a conocer? ¿Puede la previsión llevar asuntos que el pensamiento no puede alcanzar? Por completo que pueda parecer un Código no está concluso todavía, como se ve cuando se le presentan al juez mil cuestiones inesperadas. Muchas cosas quedan, por lo tanto, libradas bien al imperio de la costumbre, bien a la discusión de los hombres doctos, o bien al arbitrio de los jueces.

La misión de la ley consiste. en fijar los principios generales del derecho a grandes rasgos: establecer principios fecundos en consecuencias, y no descender al detalle de cuestiones que pueden surgir en cada materia concreta. Al juez, al jurisconsulto, penetrado del espíritu general de la ley, es a quien toca hacer las aplicaciones . . .". *Code Civil–Contenant la série des lois qui le composent, avec leurs motifs*, tomo I (1803) 13–17. Por eso la premisa del derecho codificado es ésta: que ". . . las disposiciones jurídicas no son más obscuras por su generalidad, sino que tienen al contrario la virtud de comprender un mayor número de reglas, sirviendo así mejor a las necesidades de la vida práctica que cambian constantemente". 2 Huber, El Derecho y su Realización, (trad. esp. 1929) 88–89.

Además de esa técnica legislativa, hay el *método* de investigación, aplicación e interpretación del derecho que usan los jueces y los autores, tomando como punto de partida los textos del código. Las ideas básicas de este método jurídico son que: (1) ". . . la actividad del juez o el intérprete no puede reducirse simplemente al trabajo de subsunción de los hechos bajo la norma legal, pues incumbe al juez o al jurista oficial una misión más importante de individualizar el Derecho, integrarlo con soluciones nuevas y, dentro de ciertos límites, adaptarlo a la vida y rejuvenecerlo." Castán, Teoría de la Aplicación e Investigación del Derecho, (1947) 23; (2) ". . . la labor del jurista en la investigación, elaboración y actuación del Derecho no es una función mecánica y automática, sino, muy lejos de ello, una función que debe estar presidida, en sus múltiples manifestaciones (interpretativa, sistematizadora, integradora, correctora, etc.), por la consideración de los fines del Derecho, y no sólo la de los fines aislados, sino la de los del Derecho en su conjunto y en su espíritu." *Ibid.*, 361; (3) "En el primer plano de la actividad del jurista . . . aparece el material que le suministra el Derecho positivo de que se trate . . . (pero) este material normativo no agota, tal como aparece formulado, la realidad jurídica . . . a la

ciencia jurídica le cumple el cometido de elaborar la realidad jurídica . . . para ello ha de servirse de cuantos medios de conocimiento sean aptos: observación, interpretación, análisis y síntesis conceptuales." Hernández Gil, Metodología del Derecho, (1945) 382–383. La fundamental importancia de este método jurídico ha sido advertida por los juristas angloamericanos. Por ejemplo: (1) "la actitud de nuestras cortes hacia el derecho legislado presenta un contraste con la de los civilistas que miran su legislación a la luz del principio del derecho civil que considera las disposiciones de ley como principios generales para ser usados como guías en las decisiones judiciales". Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 12–13 (1936); y (2) ". . . la objeción más seria contra un código en jurisdicciones de derecho común es que no poseemos un método jurídico adecuado para desarrollar los textos legislativos. Nuestra técnica de interpretación de estatutos no es adecuada para la aplicación de un Código." Pound, *Sources and Forms of Law*, 22 Notre Dame Law. 1, 76 (1946). Véanse además Pound, *Common Law and Legislation*, 21 Harv. L. Rev. 383 (1908) y Freund, *Interpretation of Statutes*, 65 U. Pa. L. Rev. 207 (1917).[5]

Así se explica este hecho esencial: al instituir causal de divorcio a las injurias graves, el legislador en un país de derecho civil establece una categoría que por su amplitud comprende, sin violencias, a todas las demás causas que producen la disolución del vínculo. Si aplicamos el modo de

---

[5] Sólo se puede aquí rozar de pasada y a la carrera la importancia decisiva de la técnica legislativa y del método jurídico en la vida del derecho codificado. Véanse entre otros: Gény, *Méthode d'Interpretation et Sources en Droit Privé Positif* (2a ed. rev. 1932); *Id., Science et Technique en Droit Privé Positif* (1924); Husson, *Les Transformations de la Responsabilité–Etude sur la Pensée Juridique* (1947); Bonnecase, *The Problem of Legal Interpretation in France*, 12 J. Comp. Leg. and Int'l L. (3s. 1930) 79; Renard, Introducción al Estudio del Derecho (trad. esp. 1947); Roubier, *Théorie Générale du Droit* (2a ed. rev. 1951); *The Jurisprudence of Interests* (ed. Schoch 1948); Koschaker, Europa y el Derecho Romano (trad. esp. 1955); Von Mehren, *The Civil Law System*, (1957) 821–854; y Gutteridge, *Comparative Law*, (2ª ed. 1949) 101–116. Cf. Pound, *The Theory of Judicial Decisions*, 36 Harv. L. Rev. 641, 802, 940.

pensar civilista, todos los actos enumerados como causas determinadas de divorcio no son sino variaciones del concepto omnicomprensivo de la "injuria grave." El adulterio, la condena por delito grave, el abandono, la embriaguez habitual, el conato de corrupción de los hijos, la propuesta del marido para prostituir a su mujer, etcétera, constituyen violaciones graves de los deberes recíprocos nacidos del matrimonio o hechos altamente ofensivos que imposibilitan la unión conyugal y destruyen los fines esenciales del matrimonio. Únicamente la impotencia o la locura sobrevenidas después del matrimonio pueden considerarse como causales independientes porque no hay *animus injuriandi*. ¿Quiere decir esto que la enumeración legal de las causas de divorcio resulta desprovista de todo sentido? La respuesta es, indudablemente, negativa. Las causas enumeradas son *perentorias*, es decir, que el juez no puede negarse a pronunciar el divorcio cuando resultan probadas. En cambio, cuando se trata de los otros innumerables hechos que pueden ser invocados como motivo de divorcio, el juez dispone de amplia libertad para estimar el carácter injurioso del acto y la gravedad del mismo, según la educación, posición social y demás circunstancias de hecho que puedan presentarse. *¿Se comprende ahora por qué el legislador en Francia no se sintió obligado a enumerar prolijamente las causas determinadas de divorcio?* Además queda convicta de error la afirmación dogmática que pretende sacar, como consecuencia ineludible del sistema puertorriqueño de enumeración de causas, una limitación de la "injuria grave" invocando la "intención del legislador" de reducir el arbitrio judicial. Esta afirmación es un corolario injustificado del pretendido carácter taxativo de la enumeración legal. Se trata en verdad de una variante del desacreditado tópico: *"incluso unius est exclusio alterius."* Y la atención ejemplar que en Puerto Rico el legislador ha prestado a las causas de divorcio se reduce a lo siguiente: desde 1902 hasta 1959, la Legislatura ha adicionado dos nuevas causas de divorcio: la separación y la locura incurable. Para ello se han aprobado

tres leyes en ese medio siglo: (1) Ley núm. 46 de 9 de mayo de 1933 (Leyes, pág. 305)—añadió la causal de separación por un período de más de 7 años—; (2) Ley núm. 78 de 6 de mayo de 1938 (Leyes, pág. 199)—añadió la causal de locura incurable—; y por último (3) Ley núm. 62 de 29 de abril de 1942 (Leyes, pág. 583)—redujo el período de la separación a 3 años. Por supuesto, ni la tradicional ausencia del dolo como causa de nulidad del matrimonio en nuestro derecho civil, ni la eliminación del error en 1902 tienen pertinencia en cuanto a las causales de divorcio. Son bien sabidas las importantes diferencias entre la nulidad y el divorcio en lo que respecta a los cónyuges, los hijos, los bienes, etcétera.

La doctrina de los tribunales y de los autores españoles es tan estéril sobre el sentido de la injuria grave que apenas merece ser mencionada aquí. Como es sabido, en España el régimen del matrimonio civil se aplica cuando ambos contrayentes no pertenecen a la religión católica. Además el conocimiento de los juicios sobre nulidad, disolución y separación en los matrimonios canónicos corresponde únicamente a los Tribunales eclesiásticos. En el ejercicio de su jurisdicción exclusiva, éstos aplican en esas causas las disposiciones del derecho canónico. Véase Castán, Derecho Civil Español, Común y Foral, tomo V, vol. 1 (7a ed., 1954) 66–115, 446–478. Las disposiciones del Código Civil Español que se refieren a las causas de nulidad del matrimonio y a las causas del "divorcio" (es decir, separación de lecho, mesa y habitación), sólo se aplican a los matrimonios *civiles* entre personas que no son católicos. Ni que decir hay que los matrimonios civiles son muy escasos y aún más exiguos los casos de divorcio. Por lo demás, en España sólo existe el divorcio imperfecto que nunca produce la ruptura del vínculo. Precisamente una de las reformas que introdujo en el Código Civil Español la reciente Ley de 24 de abril de 1958 fue eliminar el término "divorcio" en los arts. 104 a 107 y sustituirlo por la expresión "separación". Véanse 1 Santamaría, Comentarios al Código Civil (1958) 166–168; Ramblas y Majada, Código Civil—Inter-

pretado y Anotado, con arreglo a las modificaciones introducidas por la Ley de 24 de abril de 1958 (2a ed. rev. 1958) 115–117. La doctrina jurídica de ese país además de ser pobre, refleja, como es natural, las arraigadas ideas y creencias de la tradición española y católica respecto a la indisolubilidad del matrimonio y a la inmoralidad inherente de todo "divorcio". Ciertamente en Puerto Rico hoy día no se piensa así, y la cuestión del divorcio se mantiene fuera del terreno religioso. Hay una distancia infranqueable entre el mundo español y el nuestro respecto al divorcio, sin entrar aquí en consideraciones de bondad ni meritoriedad. En este punto las creencias en que "vivimos, nos movemos y somos" y las ideas conscientes de las gentes en Puerto Rico, son radicalmente distintas a las españolas. Cf. Castán Tobeñas, La Crisis del Matrimonio (1914); Giménez Fernández, La Institución Matrimonial (1943); Montero, el Matrimonio y las Causas Matrimoniales (4ª ed. 1945); Amo, La Defensa del Vínculo (1954); Castán, La Condición Social y Jurídica de la Mujer (1955). Así pues, parece inútil ir a esculcar los comentaristas españoles para orientarnos con miras a la solución correcta del litigio planteado.

Es cierto que la causal de "injurias graves" en Puerto Rico tomó su origen del art. 105 del Código civil español de 1889. Pero el enfoque histórico no puede convertirse ni en fanatismo ni en misticismo. Hace más de medio siglo que la línea del desenvolvimiento histórico del divorcio en nuestro país sigue una trayectoria divergente de la que marca el orden jurídico español. Nadie podría negar que hoy día las diferencias han llegado a ser radicales. De aquí que la interpretación acertada del concepto de injurias graves no dependa inexorablemente del pasado. El alcance de esa norma flexible tiene que estar en consonancia con nuestras circunstancias sociales. Y sería un error craso limitar la función judicial mediante un historicismo infundado que en realidad da por resuelta la cuestión planteada en este caso señalando que la doctrina jurídica española nunca ha aceptado la ocultación

dolosa del embarazo antenupcial como una injuria grave en materia de divorcio.

Cuando el texto de la ley remite a normas flexibles (v. gr. la injuria grave como causal de divorcio), los tribunales sólo pueden aplicarlas si las completan. Sin escape ni remisión, su legítima tarea consiste en desarrollar y adaptar el derecho a las exigencias de la vida social. Nadie puede sustituirlos en esa faena y su decisión al respecto es intransferible. Sería en verdad eludir la responsabilidad que les impone el propio legislador cualquier intento de dejar la solución del problema a los órganos legislativos. Así, dicha determinación judicial no puede tildarse de usurpación de la soberanía popular ni equivale a resolver problemas que deberían plantearse ante la Asamblea Legislativa. Como la ley delega en los jueces la función de escoger la solución concreta, es sencillamente imposible que éstos actúen en la forma propuesta por las teorías políticas de Montesquieu o de Rousseau. Al contrario: los tribunales tienen que crear normas de política pública en forma consciente y articulada. Cierto que nunca pueden olvidar su posición subordinada frente a la ley ni adoptar soluciones que no se ajusten a las convicciones que de hecho predominan y actúan efectivamente en la sociedad en que viven. Pero salta a la vista que, dentro de esos límites, es ineludible armonizar las normas judiciales sobre el sentido de la injuria grave con las realidades sociales en nuestro derredor. Están ahí e irremisiblemente hay que contar con ellas. O lo que es igual, no están a merced de que los jueces *como funcionarios* quieran o no aceptarlas; aunque *como individuos* pueden luchar contra ellas si las repudian, seguirlas si les parecen deseables, o tratar de superarlas creando otras de su propia invención.

Se trata, pues, de un proceso irremediable e inexorable en la tarea de adjudicar: hay que elegir entre varias posibilidades, proyectando sobre las circunstancias el designio o pretensión de nuestra vida social. Esa es la única vía de acceso a las "realidades" jurídicas vistas desde su perspectiva con-

creta. Y así queda claro que el quehacer de los jueces es faena de imaginación, de invención y de arte. Esto no puede ocultarse diciendo con fácil desdén que sólo mediante una intromisión de apreciaciones individuales y subjetivas podemos hallar "injuria grave" en la disimulación dolosa del embarazo antenupcial. No se diga tampoco que los jueces puedan renunciar a la responsabilidad de formular normas. Como símil esclarecedor: ¿no ocurre lo mismo cuando el legislador delega a un órgano administrativo poderes amplios y flexibles con miras a realizar ciertos fines que sólo expresa en términos generales o por insinuación? Véanse *López Salas* v. *Junta de Planificación*, 80 D.P.R. 646 (1958) y Frank, *Courts on Trial* (1949) 292-309. (⁶) Frente a la ley, el intérprete tiene que recordar el pensamiento de Heráclito: "El Señor cuyo oráculo está en Delfos no dice, ni oculta, sino hace señales." Fragmentos, núm. 11, en Gaos, Antología de la Filosofía Griega (1940) 80. Y por ello, con mano suave pero diestra y firme, la doctrina y la jurisprudencia tienen que ir creando soluciones satisfactorias dentro del marco que fija el legislador. (⁷)

---

(⁶) Cf. además, Rheinstein, *Who Watches the Watchmen?* en *Interpretations of Modern Legal Philosophies—Essays. in Honor of R. Pound* (1947) 589-610; Fuller, *Reason and Fiat in Case Law*, 59 Harv. L. Rev. 376 (1946); *Id., Positivism and Fidelity to Law*, 71 Harv. L. Rev. 630 (1958); Recaséns Siches, *op. cit.* supra, 206-291.

(⁷) Bien entendido: los tribunales gozan de un distinto margen de arbitrio según la clase de material normativo que deban aplicar. El más reducido es cuando se trata de las llamadas "reglas estrictas": aquéllas que adhieren a un supuesto de hechos preciso y detallado una consecuencia también precisa y detallada. Pero aquí se trata de un *standard* (injuria grave) que es "el tipo de norma que se halla situada en el extremo opuesto . . . (pues) el legislador en realidad deposita su poder normativo en las manos del intérprete cuando éste ha de aplicar a determinadas situaciones ciertos *standards* como buena fe, conducta razonable, justa causa, cuidado debido, etc." Puig Brutau, La Jurisprudencia como Fuente del Derecho (s. f.) 205. Véanse los ejemplos de *standards* que da Castán en Teoría de la Aplicación e Investigación del Derecho (1947) 171-173. Cf. Pound, *Social Control Through Law* (1942) 35-62, 103-134; *L'Influence du Code Civil dans le Monde—Travaux de la Semaine Internationale du Droit* (1950) 149-327. 331-554: Al-Sanhoury, *Le Standard Juridique* en *Recueil Gény*, tomo II (1935) 144-156.

En resumen, la falta de la mujer en el caso de autos constituye en Puerto Rico una injuria grave suficiente para decretar el divorcio solicitado por el marido. Pero el tribunal "a quo" erró al hacer el pronunciamiento adicional innecesario de que era ilegítimo el hijo nacido dentro del matrimonio el día 21 de febrero de 1954, es decir, seis meses y tres días después del casamiento. En primer lugar, el hijo no era parte en el pleito de divorcio y, en todo caso, no se le nombró un defensor judicial para proteger sus derechos. *Chabrán* v. *Méndez*, 74 D.P.R. 768 (1953). Además, en una acción instada por una persona con derecho a impugnar la legitimidad,[8] el tribunal tendría que considerar la regla de que contra la legitimidad de los hijos nacidos después de los ciento ochenta días siguientes a la fecha de la celebración del matrimonio ". . . no se admitirá otra prueba que la imposibilidad física del marido para tener acceso a su mujer en los primeros ciento veinte días de los trescientos que hubieren precedido al nacimiento . . ." Art. 113 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 461. Véanse *Cubano* v. *Del Valle*, 69 D.P.R. 579 (1949); S. 24 de enero 1947 del T. S. de España, 17 Jur. Civ. (2a s.) 322; Puig Peña, *op. cit.*, supra, tomo II, Vol. II (1953) 33–38; 1 Manresa, *op. cit.*, supra, 642–680.[9]

---

[8] De conformidad con el art. 116 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 464, la legitimidad sólo puede ser impugnada por el marido o por sus legítimos herederos en los casos siguientes: (*a*) si el marido hubiese fallecido antes de transcurrir el plazo señalado para deducir su acción en juicio, (*b*) si muriese después de presentada la demanda sin haber desistido de ella, y (*c*) si el hijo nació después de la muerte del marido. También puede impugnar la legitimidad el propio hijo como un incidente de la acción de filiación que le concede la Ley núm. 229 de 1942 (Leyes, pág. 1297). Véanse *Agosto* v. *Javierre*, 77 D.P.R. 471 (1954); *Chaulón* v. *Chabrán*, 79 D.P.R. 303 (1956) y *Pérez* v. *Torres*, 79 D.P.R. 611 (1956).

[9] La presunción del citado art. 113 sólo se aplica en una acción en que se impugna la legitimidad de un hijo nacido del matrimonio. Obviamente no entra en juego en esta acción de divorcio. Por otro lado, la presunción *"concluyente"* que establece el art. 463 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1886, sólo se refiere al caso en que los cónyuges hacen vida marital *al momento de la concepción* y en que el período de gestación *no es contrario a las leyes de la naturaleza*. *Estate of McNamara*, 183 Pac. 552 (Cal. 1919) y *Anderson* v. *Anderson*, 5 P.2d 881 (Cal. 1931).

Asimismo habría que tener en cuenta el término de prescripción de la acción para impugnar la legitimidad del hijo: tres meses después de la fecha de inscripción del nacimiento en el Registro si el marido se hallare en Puerto Rico, y seis meses si estuviere fuera de Puerto Rico, a contar desde que tuvo conocimiento del nacimiento. Art. 117 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 465.

Siendo ello así, procede eliminar el referido pronunciamiento relativo al hijo, y así modificada debe confirmarse la sentencia recurrida.